**CLARKSBURG PUBLISHING COM-
PANY, Appellant,**

v.

**FEDERAL COMMUNICATIONS COM-
MISSION, Appellee,**

Ohio Valley Broadcasting Corpora-
tion, Intervenor.

**No. 12441.**

United States Court of Appeals
District of Columbia Circuit.

Argued March 21, 1955.

Decided June 9, 1955.

512

Messrs. Cecil B. Highland, Jr., and John S. Stump, Jr., Clarksburg, W. Va., both of the bar of the Supreme Court of Appeals of West Virginia, pro hac vice, by special leave of Court, with whom Mr. Edmund D. Campbell, Washington, D. C., was on the brief, for appellant.

Mr. Richard A. Solomon, Asst. Gen. Counsel, Federal Communications Commission, for appellee. Messrs. Warren E. Baker, Gen. Counsel, Federal Communications Commission, J. Smith Henley, Asst. Gen. Counsel, Federal Communications Commission, Harrison, Ark., and Warren D. Quenstedt, Atty., Federal Communications Commission, were on the brief for appellee.

Mr. Leonard H. Marks, Washington, D. C., with whom Mr. Paul Dobin, New York City, was on the brief, for intervenor.

Before EDGERTON, BAZELON and BASTIAN, Circuit Judges.

BAZELON, Circuit Judge.

Clarksburg Publishing Company owns a daily newspaper in Clarksburg, West Virginia. It protested the Federal Communications Commission's grant of a permit to the Ohio Valley Broadcasting Corporation [1] for the construction of a new commercial television station to operate on Channel 12 in Clarksburg. The protest asserted that the Commission's action was contrary to the public interest because the grant was made within one day after the mutually exclusive application of the Clarksburg Broadcasting Corporation [2] was withdrawn; and because it is inconsistent with (1) the rule prohibiting multiple ownership and control of television stations and (2) the Commission's policy of favoring diversification of all the media of mass communication. The protest also questioned the propriety of a payment of $14,390 by Ohio Valley to the Broadcasting Corporation at the time it withdrew. The protest was denied and Clarksburg brought this appeal.[3]

The question for review is whether the Commission erred in denying the protest. The denial constituted a determination that the grant to Ohio Valley served the public interest, convenience, and necessity. We conclude that denial rested on a seriously inadequate record and is, therefore, erroneous. Accordingly, we remand the case to the Commission for further hearing upon a reopened record.[4]

---

1. For convenience, the Clarksburg Publishing Company will hereafter be referred to as Clarksburg; Ohio Valley Broadcasting Corporation as Ohio Valley.

2. For convenience, Clarksburg Broadcasting Corporation will hereafter be referred to as the Broadcasting Corporation. It is unrelated to the protestant Clarksburg Publishing Company.

3. This court has jurisdiction over this appeal under 47 U.S.C.A. § 402(b). Metropolitan Television Co. v. United States (1955), 95 U.S.App.D.C. ——, 221 F.2d 879.

4. 66 Stat. 720, 47 U.S.C.A. § 402(h) (1952).

## I.

### The Commission's Treatment of the Protest

■ The inadequacies of the record are directly attributable to the Commission's failure to follow the letter and spirit of § 309(c) which embodies the protest procedure of the Communications Act.[5] That section, adopted as one of several amendments to the Act in 1952, was fitted into the statutory scheme "to make definite and certain the procedural rights and remedies of those who oppose, as well as those who apply for" a license.[6] It added specific authorization for protesting any grant made without hearing and requires the Commission to re-examine its action in a hearing upon protest by a "party in interest" who alleges "with particularity the facts, matters, and things relied upon".[7]

■ The Commission found—and we agree—that Clarksburg's protest met both the "party in interest" [8] and "particularity" requirements of § 309(c). But the Commission accepted the facts alleged in the protest as if admitted by demurrer and limited the "hearing" to oral argument. In the circumstances of this case, we think this procedure did not satisfy the statutory command.

■ Section 309(c) provides that issues upon which a hearing is indicated should be "tried" according to the procedure prescribed by § 309(b). The latter section, which is also applicable to hearings upon denial of a grant, calls for a "full hearing" and, like 309(c), refers to the "burden of proceeding with the introduction of evidence" and the "burden of proof." Congress could not have expressed in plainer words its intent that, where there are unresolved factual is-

---

5. That section provides in pertinent part: "When any instrument of authorization is granted by the Commission without a hearing as provided in subsection (a) of this section, such grant shall remain subject to protest as hereinafter provided for a period of thirty days. During such thirty-day period any party in interest may file a protest under oath directed to such grant and request a hearing on said application so granted. Any protest so filed shall contain such allegations of fact as will show the protestant to be a party in interest and shall specify with particularity the facts, matters, and things relied upon, but shall not include issues or allegations phrased generally. The Commission shall, within fifteen days from the date of the filing of such protest, enter findings as to whether such protest meets the foregoing requirements and if it so finds the application involved shall be set for hearing upon the issues set forth in said protest, together with such further specific issues, if any, as may be prescribed by the Commission. In any hearing subsequently held upon such application all issues specified by the Commission shall be tried in the same manner provided in subsection (b) of this section, but with respect to all issues set forth in the protest and not specifically adopted by the Commission, both the burden of proceeding with the introduction of evidence and the burden of proof shall be upon the

protestant. * * *" 66 Stat. 715, 47 U.S.C.A. § 309(c) (1952).

6. S.Rep. No. 44, 82d Cong., 1st Sess. 8 (1951). It is a "necessary corollary" of § 308, which deals with the procedure the Commission is to employ in the exercise of its radio licensing functions. Ibid.

7. Supra note 5.

8. Intervening in defense of the grant, Ohio Valley challenges the Commission's ruling that the protest procedure was properly invoked by Clarksburg as a "party in interest" under the statute. The Commission found that Clarksburg, though not a broadcast licensee or an applicant for a license, had standing by reason of the "direct competitive injury" that would be caused "a competing medium of expression" which, like a television station, "relies upon advertising as its main source of revenue." Ohio Valley Broadcasting Corp., 10 Pike & Fischer Radio Reg. 452, 456 (1954). We think the Commission's view is supported by Federal Communications Commission v. Sanders Bros. Radio Station, 1940, 309 U.S. 470, 642, 60 S.Ct. 693, 84 L.Ed. 869, 1037; Metropolitan Television Co. v. United States, —— U.S.App.D.C. ——, 221 F.2d 879; Camden Radio, Inc., v. Federal Communications Commission, 1955, 94 U.S.App.D.C. 312, 220 F.2d 191, 195, and National Coal Association v. Federal Power Commission, 1951, 89 U.S. App.D.C. 135, 191 F.2d 462.

sues, the hearing should be of an evidentiary nature.

Section 309(c) also provides that if, as here, the Commission finds that the protest meets the "party in interest" and "particularity" requirements, "the application involved shall be set for hearing upon the issues set forth in said protest, *together with such further specific issues, if any, as may be prescribed by the Commission."* [9]

■ The statute contemplates that, in appropriate cases, the Commission's inquiry will extend beyond matters alleged in the protest in order to reach any issue which may be relevant in determining the legality of the challenged grant. Clearly, then, the inquiry cannot be limited to the facts alleged in the protest where the Commission has reason to believe, either from the protest or its own files, that a full evidentiary hearing may develop other relevant information not in the possession of the protestant. Here, as will fully appear from the discussion which follows, the Commission had ample reason for extending the inquiry. Nevertheless, by adopting the technical demurrer approach, it precluded such development and confined itself to a consideration of the facts and issues set forth in the protest. However unwittingly, the Commission seems to have assumed the defense of its grant, rather than the public interest, as its primary role in the proceedings.

We turn now to discuss the various respects in which the record is deficient for the purpose of determining the legality of the grant to Ohio Valley.

### The Alleged Conflict with the Multiple Ownership Rule

Protestant claims that Ohio Valley will have direct or indirect ownership interest in two television stations in the same community by reason of (1) the substantial overlap of the service areas of the proposed Clarksburg station and WTRF–TV in Wheeling (58 miles northwest of Clarksburg), both of which are controlled by the same interests; [10] and (2) the reception in the city of Clarksburg of an excellent signal from WTRF–TV by means of two community antenna cable services. Ohio Valley's interest is said to constitute a violation of that portion of the Commission's multiple ownership rule which bars the grant of a license to a party who "directly or indirectly owns, operates, or controls another television broadcast station which serves substantially the same area." [11] This rule is an expression of the Commission's policy of promoting diversification of control of the mass media of communication.

That the service areas of the two stations overlap is clear.[12] The Commission

---

9. 66 Stat. 715, 47 U.S.C.A. § 309(c) (1952), emphasis supplied.

10. WTRF–TV is owned by Tri-City Broadcasting Company, in which News Publishing Company, the parent corporation of Ohio Valley, has a 34 percent interest. The Commission assumed that News Publishing Company had actual working control of WTRF–TV.

11. 47 C.F.R. § 3.636(a) (1) (Rev. 1953). Rule 3.636 provides:
 "*Multiple ownership.* (a) No license for a television broadcast station shall be granted to any party (including all parties under common control*) if
 "(1) Such party directly or indirectly owns, operates, or controls another television broadcast station which serves substantially the same area; or
 "(2) Such party, or any stockholder, officer or director of such party, directly

or indirectly owns, operates, controls, or has any interest in, or is an officer or director of any other television broadcast station if the grant of such license would result in a concentration of control of television broadcasting in a manner inconsistent with public interest, convenience, or necessity. In determining whether there is such a concentration of control, consideration will be given to the facts of each case with particular reference to such factors as the size, extent and location of areas served, the number of people served, and the extent of other competitive service to the areas in question. * * *"

* "The word 'control' as used herein is not limited to majority stock ownership, but includes actual working control in whatever manner exercised."

12. The Commission divides service areas into two classes. The Grade A service

found that a common area of 16,870 square miles would be served with a Grade B signal from both stations. It concluded, however, that no overlap of the Grade A contours of the stations existed. Presumably this conclusion was based on the February 12 amendment to Ohio Valley's application in which the effective radiated power of the proposed station. was reduced from 50.6 to .4 kilowatts.[13] At the reduced power, according to the affidavit of Ohio Valley's engineer, there was no overlap, but in fact a two-mile separation between the Grade A contours of the stations.[14]

Treating only a Grade A overlap as decisive in applying Rule 3.636(a) (1), the Commission concluded that the stations did not, by virtue of Grade B overlap, serve substantially the same area. No reason is supplied for the mechanical application of the Grade A-Grade B rule, but it is apparently based on the assumption that the degree and quality of service within the Grade B contour are not sufficiently susceptible of definite measurement to justify considering that service for purposes of overlap. Whether or not this assumption is sound in the present state of development of the en-

gineering art cannot be concluded from this record. Where, as here, the Grade B overlap is substantial (and, indeed, the Grade A contours are barely separated), it seems a fair assumption that receivers in the area of overlap would receive acceptable signals from both stations. If this is true, and to the extent that it is, the Commission's own rule would seem to dictate that the overlap be considered. Nothing in this record tells us why the Commission decided that the instant Grade B overlap would not constitute serving "substantially the same area" within the meaning of the rule.

### Community Antenna Television Systems

In determining the overlap question, the Commission refused to consider the service provided by two privately owned community television antenna systems which carry the programs of WTRF–TV to Clarksburg.[15] These systems are a comparatively new development in the short history of television and their operation in this case poses a novel question in interpreting 3.636(a) (1).

Our review of this aspect of the case is frustrated by the absence of any evi-

area is one in which a good picture may be expected to be available for at least 90 percent of the time at the best 70 percent of receiver locations at the outer limits of that service area. The Grade B service area is one in which a good picture may be expected for 90 percent of the time at 50 percent of the locations. See the Sixth Report and Order, Federal Communications Commission, 17 Fed. Reg. 3905, 3915 (1952).

13. Overlap of the Grade A contours would occur, however, if the Wheeling station, "presently authorized to operate at less than maximum power," were "to operate under the maximum height and power permitted by the rules. * * *" And, of course, if the Clarksburg station, at a later date, applies for and is granted an increase in antenna height or power, a similar overlap might occur.

14. The roughly circular shape of the contour is obtained by connecting points located on radials drawn from the transmitter site at 45° intervals. The engi-

neering report accompanying Ohio Valley's amended application shows that the Grade A contours of WTRF–TV and the proposed Clarksburg station would be exactly tangential (even at the reduced power proposed by the amendment), if the contours were drawn along the usual radials, 45° apart. In the new engineering report, however, Ohio Valley drew a radial in the direction of Wheeling (midway between the 315° radial and the 0° radial) and indicated that the WTRF–TV Grade A contour would abruptly loop northwestward at the point of intersection of that radial, thereby avoiding contact with the Grade A contour of the proposed Clarksburg station.

15. An "excellent quality signal" from the station is received by approximately 10,000 Clarksburg subscribers, and a potential viewing audience of 35,000 persons is likely in the near future. Programs of WDTV in Pittsburgh and WJAC–TV in Johnstown, Pennsylvania, are also received.

dence in the record as to the character of these systems,[16] their regulatory status, the manner in which they are owned and operated, the arrangements made for the broadcast of programs, and the nature of the relationship between those in control of the systems and the stations whose programs they carry.[17] That these problems are unresolved in the Commission's mind is apparent from the fact that it has not as yet determined the extent of its jurisdiction over community antenna services.[18]

The Commission will presumably assert jurisdiction to regulate community antenna systems if and when it concludes that such systems provide or are adjuncts of a broadcast service. Its failure thus far to assert such jurisdiction, standing by itself, cannot support a conclusion that the systems are not service within the meaning of the rule. It is unrealistic to overlook the fact that, through the community systems, Clarksburg residents are receiving and are, in a sense, being served by the programs of the Wheeling station. To the extent that this reinforces the voice of Ohio Valley in the city of Clarksburg, it would appear to be contrary to the policy embodied in the multiple ownership rule. It is true that Ohio Valley has no property interest in the systems and does not exercise any control of the programs which are received in Clarksburg. But this does not tell us whether Ohio Valley may prevent the systems from carrying its programs free of charge or whether it has elected to tolerate the system for the additional audience it brings and the consequently increased value of the station to advertisers.

### Concentration of Control and Diversification of Mass Communications Media

The grant to Ohio Valley, Clarksburg says, "would result in a concentration of control of television broadcasting in a manner inconsistent with the public interest, convenience or necessity," in violation of § 3.636(a) (2) of the Commission's rules, and would contravene its general policy of encouraging diverse ownership of all mass media of communication.[19]

16. The Commission's brief tells us that community antenna television systems amplify and distribute television signals of good quality to areas where reception is non-existent or difficult. Reception is bolstered in weak signal areas by the installation of a common antenna for the whole area at a favorable location, such as a high hill or a mountain. The antenna picks up a steady signal from a distant television broadcast station, and transmits it by wire to the cable of the community receiving service. Individual television sets of subscribers are connected to the cable, and relay amplifiers are located throughout the system so that each home receives an equally clear signal regardless of location.
 An initial service charge ranging from $125 to $175 is made for the privilege of hooking on to the cable; a fixed monthly service charge of from $2.50 to $7.00 is imposed thereafter. Address by Commissioner John C. Doerfer, National Association of Railroad and Utilities Commissioners, 14 Fed.Com.B.J. 4, 5 (1955).

17. Only the following information appeared in the Commission's conclusions: "Community antenna systems are private business activities that may be varied or discontinued at will, and this Commission has exercised no jurisdiction over them; and Ohio Valley has no interest, direct or indirect, in the community antenna systems operating in Clarksburg."

18. Although it has been studying the question for some time, the Commission is uncertain whether the system should be deemed a broadcast service or a common carrier, and whether its operations are sufficiently interstate in character to justify or require federal regulation. Address by Commissioner John C. Doerfer, National Association of Railroad and Utilities Commissioners, supra; Federal Communications. Commission Annual Report 34 (1953); Federal Communications Commission Annual Report 92 (1954).

19. "Aside from the specific question of common ownership of newspapers and radio stations, the Commission recognizes the serious problem involved in the broader field of the control of the media of mass communications and the importance of avoiding monopoly of the avenues of communicating fact and opinion to the public. All the Commissioners agree to the general principle that di-

■ The soundness of these guides to the Commission's licensing function is not open to question. These guides, like the First Amendment, rest "on the assumption that the widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public * * *."[20] Diversification, according to the Commission, "protects the public from being placed in the position of having to depend upon a single or monopolistic source for its information about current affairs."[21] This court has strongly supported the Commission's view that diversification is an important component of the public interest.[22]

■ The facts relating to Ohio Valley's dominant role in the dissemination of information in the West Virginia area are uncontroverted. As the Commission pointed out in its order, "Concededly, Ohio Valley, through its own operations and those of its parent corporation and affiliated and subsidiary companies, does have widespread interests in the media for mass communications in the West Virginia area." This conclusion has persuasive support in the record. In the broadcast field, Ohio Valley's interests consist of ownership of standard broadcast station WPAR in Parkersburg, West Virginia; FM broadcast station WPAR–FM in Parkersburg, West Virginia; and standard broadcast station WBLK in Clarksburg. The News

Publishing Company, which owns 89 percent of Ohio Valley's stock, has a 34 percent controlling interest in the Tri-City Broadcasting Corporation, which is the licensee of FM, AM and television stations in Wheeling.

In the newspaper field, the influence which the Ohio Valley interests exert in West Virginia is even more clearly marked.

News Publishing Company publishes morning, evening and Sunday newspapers in Wheeling, and through subsidiary or affiliated companies, publishes newspapers in eight other cities in West Virginia.[23] Nine communities in West Virginia, including Wheeling, Parkersburg and Fairmont (the third, fifth and sixth largest cities, respectively), are completely dependent on the Ohio Valley interests for their local daily newspapers.[24] Out of only nine cities in the state which have both morning and evening daily newspapers, Ohio Valley controls both newspapers in three: Fairmount, Parkersburg and Wheeling. Ohio Valley also controls six of the twelve single daily newspapers published in the state. Circulation figures provide further evidence of Ohio Valley control. The combined circulation of all daily newspapers published in the northern, north central and eastern portions of West Virginia, where Ohio Valley interests predominate, is 191,922. Of this figure, 121,005 represents the daily circulation of newspapers

versification of control of such media is desirable. The Commission does not desire to discourage legally qualified persons from applying for licenses, but does desire to encourage the maximum number of qualified persons to enter the field of mass communications, and to permit them to use all modern inventions and improvements in the art to insure good public service." Newspaper Ownership of Radio Stations, F.C.C. Notice, 9 Fed.Reg. 702, 703 (1944).

20. Associated Press v. United States, 1945, 326 U.S. 1, 20, 65 S.Ct. 1416, 1424, 89 L.Ed. 2013.

21. Cowles Broadcasting Co., 10 Pike & Fischer Radio Reg. 1289, 1314 (1954).

22. Scripps-Howard Radio, Inc., v. Federal

Communications Commission, 89 U.S. App.D.C. 13, 19, 189 F.2d 677, 683, certiorari denied, 1951, 342 U.S. 830, 72 S. Ct. 55, 96 L.Ed. 628; Plains Radio Broadcasting Co. v. Federal Communications Commission, 1949, 85 U.S.App.D.C. 48, 52, 175 F.2d 359, 363.

23. News Publishing owns 100 percent of the stock of newspaper companies in Weirton, Elkins, Fairmont and Martinsburg, and over 80 percent of the companies in Parkersburg and Welch. The Parkersburg Company, in turn, controls two other newspapers in Point Pleasant and Williamson.

24. The majority of officers and directors of Ohio Valley and its parent hold offices in the companies publishing papers in these nine communities.

published or controlled by News Publishing Company.

These facts stood admitted for purposes of oral argument. In the face of these admissions, it is difficult to understand how the Commission could have concluded that the grant would not result "in an unlawful concentration of control or in a monopoly of the media for mass communications in the West Virginia area." [25] The proximity of the Wheeling and proposed Clarksburg television stations directly posed the question of whether their common ownership constituted "concentration of control of television broadcasting" within the meaning of Rule 3.636(a)(2). In determining application of this rule, the Commission considers the "size, extent and location of areas served, the number of people served, and the extent of other competitive service to the areas in question." [26] We find no evidence that it did so here. Moreover, the effect of this grant is not only to place under common ownership two television stations within 58 miles but also to add another medium in the communications field to the many which Ohio Valley already has in West Virginia. The broadcast and newspaper interests of Ohio Valley are far-ranging, and the addition of a television station cannot fail to augment its influence and power in the state.

Nothing in the present protest record dispels the strong impression that, on the concentration of control issue alone, the grant would not be in the public interest.

There may, however, be matters not apparent to us which entered into the Commission's determination. Upon the remand we order now, the Commission will have opportunity to place such matters, if any, in the record and to base reconsideration of its decision on the expanded record. The record should reflect all the available facts relating to Ohio Valley's interests in the communications media, including, but not limited to, the manner in which it has operated its stations and newspapers and the effect that these interests have had upon the existence of competing sources of information in the West Virginia area. [27]

### Ohio Valley's $14,000 Payment to the Clarksburg Broadcasting Corporation

 Withdrawal of the Broadcasting Corporation's application on February 16, 1954—one day before the grant was made—freed the Ohio Valley application from contest and the rigors of a comparative hearing. No explanation for the withdrawal was offered to the Commission. A letter from Ohio Valley's attorney, dated and received on the day of the withdrawal, merely advised the Commission that it had "agreed to reimburse Clarksburg Broadcasting Corp. in the amount of $14,390 for out-of-pocket expenses incurred in the preparation and prosecution of its application." " * * * we have been informed," the letter added, "that considerable expense has been incurred as a result of engineering problems. * * *" [28]

---

**25.** Final Decision, Ohio Valley Broadcasting Corp., reprinted in 10 Pike & Fischer Radio Reg. 969, 985 (1954).

We do not think this conclusion may rest, as the Commission suggests, on the fact that (1) Ohio Valley owns no newspaper in Clarksburg; and (2) Ohio Valley is not automatically disqualified from the grant here by reason of its extensive newspaper interests.

**26.** Rule 3.636(a) (2), 47 C.F.R. § 3.636(a) (2), (Rev.1953), quoted in full supra note 11.

**27.** Such considerations were deemed relevant by the Commission in deciding whether an FM license should be denied

in Mansfield Journal Co. v. Federal Communications Commission, 1950, 86 U.S. App.D.C. 102, 105–107, 180 F.2d 28, 31–33.

**28.** The body of the letter reads:

"The Commission records will reflect that the application of Clarksburg Broadcasting Corp. for television facilities at Clarkburg, West Virginia has been dismissed (File No. BPCT–1175).

"In this connection you are advised that Ohio Valley Broadcasting Corporation, the remaining applicant for this channel, has agreed to reimburse Clarksburg Broadcasting Corp. in the amount of $14,390 for out-of-pocket expenses

The Commission denied the protestant's request for an inquiry into the matter on the ground that the protest alleged no facts beyond the payment itself. The Commission thought the payment per se was "not disproportionate to similar settlements" in other cases and concluded that the agreement did not "disserve the public interest in expediting the prompt inauguration of new television service."

The Commission recognizes that a public interest question may be involved if one of two mutually exclusive applicants buys out his sole competitor who "voluntarily" withdraws. In certain instances, the Commission has undertaken to insure that no consideration other than "out-of-pocket expenses" has been paid the dismissed applicant.[29] Where mutually exclusive applications have been designated for hearing and one is dismissed,[30] the Commission has, in recent cases, directed its hearing examiner to "consider the relevant facts regarding the dismissal of the competing application."[31] Even where, as here, no hearing date has been set, the Commission has reviewed the question of "whether the parties, arrangements and contemplated transactions are consistent with our established policies to prevent abuse of our processes."[32]

We do not think the Commission could properly have found, on this record, that no abuse was involved in the withdrawal of the Broadcasting Corporation. It refused to consider any other "facts, matters, and things" than the advice of Ohio Valley's counsel that the $14,390 payment was for expenses. It had no information concerning the details and no assurances that other considerations were not involved. The extent to which the Commission may wish to require itemization of expenses,[33] identification of the parties negotiating the agreement, and details of the arrangements between competing applicants, in order to determine if improper consideration was paid or promised for dismissal, is a matter for the Commission's judgment. But evidence along these lines is indispensable to the Commission's conclusion that all is well.

## II.

### The Commission's Action of February 17, 1954

Our decision that a "full hearing" is required here is reinforced by the conviction that the Commission may have accorded inadequate consideration to the public interest factors we have mentioned when it made the grant to Ohio Valley on February 17, 1954. This conviction

---

incurred in the preparation and prosecution of its application. In this connection, we have been informed that considerable expense has been incurred as a result of engineering problems which were encountered, and that it was necessary to investigate several sites and to prepare engineering reports for several locations."

29. We express no opinion at this time as to whether the payment of "out-of-pocket expenses" may in itself be contrary to the public interest. In this connection, see Four States Broadcasters, Inc., 3 Pike & Fischer Radio Reg. 1545 (1947).

30. In this event, a petition for dismissal of an application "without prejudice" must be supported by an affidavit of a "person with knowledge of the facts as to whether or not consideration has been promised to or received by petitioner, di-

rectly or indirectly" in connection with the dismissal. 47 C.F.R. § 1.366 (Rev. 1953). We are not informed upon what basis the Commission is willing to accept lesser proof where the applications have not been designated for hearing, e. g., the letter of counsel for the remaining applicant.

31. Arkansas Television Co., 11 Pike & Fischer Radio Reg. 359, 360 (1954); Family Broadcasting Corp., 10 Pike & Fischer Radio Reg. 644d, 646 (1954); Matter of Woodruff, 9 Pike & Fischer Radio Reg. 385, 386 (1953).

32. Cherry & Webb Broadcasting Co., 11 Pike & Fischer Radio Reg. 859, 906 (1955).

33. See John Poole Broadcasting Co., 9 Pike & Fischer Radio Reg. 547, 549–50 (1953).

stems from the chronology of events preceding the grant.

Ohio Valley's original application, filed on February 14, 1952, requested facilities to operate at an effective radiated power of 50.6 kilowatts and obligated the licensee to operate for six hours daily. It included a detailed exhibit listing the corporate interests of the applicant, its officers, directors and stockholders, and its parent corporation, News Publishing Company. Thereafter, the mutually exclusive application of Clarksburg Broadcasting Corporation was filed. By letter of January 6, 1954, the Commission advised both applicants that a comparative hearing would be required but no date was designated.

From 1952 through early 1954, Ohio Valley proposed no significant change in power. On February 12, 1954, however, it amended its application by reducing the effective radiated power from 50.6 kilowatts to 4 kilowatts in order to eliminate the overlap of the Grade A contours of the Wheeling and the proposed Clarksburg stations, seeking thus to avoid the multiple ownership rule which bars two commonly controlled television stations from serving "substantially the same area."

On February 16, 1954, four days after this amendment, the Broadcasting Corporation, without explanation, withdrew its application. No public notice of the withdrawal was possible prior to the grant. On the same date, the letter from Ohio Valley's counsel concerning the $14,390 payment was submitted. At the meeting of the Commission on the very next day Ohio Valley's application was

granted. No formal order reflecting this action, however, appears in the record.

To justify its quick action, the Commission relies upon the same rule cited by the protestant. This rule provides that when an application "which *has not* been reached for processing becomes unopposed," the Commission may act upon it at a "succeeding regular meeting as promptly as processing and review by the Commission can be completed." [34] It is difficult to see how this rule can be applicable, in the face of the Commission's assertion that the Ohio Valley application *had already* been processed when the rival applicant dropped out. Assuming, arguendo, that the rule is applicable, the Commission reads it to permit summary grant of an application even where, as here, the opposing applicant has dropped out less than a day before the "succeeding" meeting.

■ We are not informed—and we do not say—whether the Commission's action satisfied the rule's specific requirement for completion of "processing and review." But we point out that neither the Commission's "review" function under the rule nor its licensing function under the statute is performed merely by a determination (set forth earlier in its notice for consolidated hearing) that both applicants were "legally, technically and financially qualified" to receive the grant. The Commission does not stand in the position of a "traffic policeman with power to consider merely the financial and technical qualifications of the applicant." [35] The preliminary determination, made on the basis of infor-

---

34. Section 1.371, n. 10, subpar. (e), 47 C.F.R. § 1.371, n. 10, subpar. (e) (Rev. 1953), emphasis supplied. The rule provides:

"(e) Where a mutually exclusive application on file with the Commission which has not been reached for processing becomes unopposed, * * * the remaining application may be available for consideration on its merits by the Commission at a succeeding regular meeting as promptly as processing and review by the Commission can be completed."

Footnote 10 of § 1.371 was deleted after the Ohio Valley grant was made and a new rule, 1.378, now governs. Subsection (d) of 1.378 adopts the procedure set out in the last clause of (e) above "where a mutually exclusive application on file becomes unopposed." 19 Fed.Reg. 6881 (1954).

35. Mansfield Journal Co. v. Federal Communications Commission, 1950, 86 U.S. App.D.C. 102, 106, 180 F.2d 28, 32; National Broadcasting Co. v. United States, 1943, 319 U.S. 190, 215–218, 63 S.Ct. 997, 87 L.Ed. 1344.

mation required by § 308(b),[36] is neither a substitute for nor the equivalent of the conclusion required by § 309(a). Even under the Commission's rules, these are separate determinations.[37] And it is clear that § 309(b)'s mandate—requiring, apart from the earlier finding, a considered finding that the grant will serve the public interest—must be followed even where an application is unopposed.

Up until February 16, when the Broadcasting Corporation withdrew, a comparative hearing was contemplated in which public interest considerations would have been thoroughly explored in the record. The drop-out of the Broadcasting Corporation on the very eve of the grant made such an exploration impossible without more time. Some of the matters which, on the face of this record at least, appear to have been unresolved were: the existence or non-existence of a Grade A overlap posed by the five-day old amendment; the effect of the conceded Grade B overlap between the Wheeling station and the proposed Clarksburg station; the possible significance of community television antenna systems as a broadcast service; the extent to which the newspaper and broadcast interests of Ohio Valley should militate against a grant; and the probative value of an unsworn statement by counsel for Ohio Valley that his client's payment to its adversary was for "out-of-pocket expenses" only.

There may be cases in which the Commission, in one day, can review an application and properly determine that a grant would be in the public interest. Perhaps the present case is among them. But because this record gives no reason to think that it is, we feel that the "full hearing" called for by the protest is essential to permit the Commission to re-examine the propriety of its February 17 action.

The Commission finds support for its action in its announced policy to accelerate the inauguration of television service after the "freeze" on new television authorizations was lifted.[38] Without minimizing the force of this objective, we think Congress did not intend that the Commission should abandon consideration of long range public interests in order to further short and, perhaps, doubtful ones. This court's decision in Mansfield Journal Co. v. Federal Communications Commission [39] made plain that, unless the Commission is properly assured that its action will serve the public interest, it should not make any grant.

### III.

### Conclusion

We recognize that compliance with the procedural and public interest requirements of the Act may have the effect of leaving Channel 12 open and

---

36. This section reads:
"All applications for station licenses, or modifications or renewals thereof, shall set forth such facts as the Commission by regulation may prescribe as to the citizenship, character, and financial, technical, and other qualifications of the applicant to operate the station * *." 48 Stat. 1085 (1934), as amended, 66 Stat. 715, 47 U.S.C.A. § 308(b) (1952).

37. Under Rule 1.382, 47 C.F.R. § 1.382 (Rev.1953), a grant without a hearing may be made "where it appears from an examination of the application and supporting data that (1) the applicant is legally, technically, and financially qualified * * * *and* (5) a grant of the application would be in the public interest * * *." Emphasis supplied.

38. The freeze was imposed pending resolution of all existing engineering and assignment questions in a comprehensive allocation program. 13 Fed.Reg. 5860 (1948). With the release of its Sixth Report and Order, 17 Fed.Reg. 3905 (1952), the Commission promulgated a table of channel assignments applicable throughout the nation and established certain priorities to be followed by the Commission in the consideration and disposition of the applications on file.

39. 1950, 86 U.S.App.D.C. 102, 180 F.2d 28. In that case, we sustained the Commission in its denial of an FM license when, at the time of the final argument and decision, the appellant was the sole applicant. The denial was based on the Commission's determination that it was contrary to the public interest to grant a license to a newspaper which attempted to suppress competition in advertising and news dissemination.

depriving the people of Clarksburg of immediate local television service.[40] But that consideration does not, we think, justify a grant which the Commission, when it receives and reviews all the pertinent evidence, may determine is contrary to the public interest.

The Commission's Order Denying the Protest Is Reversed and the Case Is Remanded for Further Proceedings Consistent with this Opinion.

40. Congress was not unaware of this possibility when it enacted the "full hearing" protest procedure of § 309(c) on July 16, 1952. 66 Stat. 715. Its action followed the release, on April 14, 1952, of the Sixth Report and Order, supra note 38, which lifted a four-year freeze on grants. And the section became law in the face of the Commission's objection that the effect of this procedure would be to delay the granting of television applications. 98 Cong.Rec. 7393 (1952).