CBS TELEVISION NETWORK AFFILI-
ATES ASSOCIATION, Petitioner,

v.

FEDERAL COMMUNICATIONS COM-
MISSION and United States of
America, Respondents,

Rocky Mountain Broadcasters Association
and National Citizens Committee for
Broadcasting, et al., Intervenors.

NBC TV AFFILIATES BOARD OF
DELEGATES, Petitioner,

v.

FEDERAL COMMUNICATIONS COM-
MISSION and United States of
America, Respondents.

ABC TELEVISION NETWORK AFFILI-
ATES ASSOCIATION, Petitioner,

v.

FEDERAL COMMUNICATIONS COM-
MISSION and United States of
America, Respondents.

NATIONAL ASSOCIATION OF
BROADCASTERS, Petitioner,

v.

FEDERAL COMMUNICATIONS COM-
MISSION and United States of
America, Respondents.

SACRAMENTO VALLEY TELEVISION,
INC., Petitioner,

v.

FEDERAL COMMUNICATIONS COM-
MISSION and United States of
America, Respondents.

GOLDEN EMPIRE BROADCASTING
COMPANY, Petitioner,

v.

FEDERAL COMMUNICATIONS COM-
MISSION and United States of
America, Respondents.

CAPITAL CITIES COMMUNICATIONS,
INC., Petitioner,

v.

FEDERAL COMMUNICATIONS COM-
MISSION and United States of
America, Respondents.

IDAHO TELEVISION CORPORATION
et al., Petitioners,

v.

FEDERAL COMMUNICATIONS COM-
MISSION and United States of
America, Respondents.

Nos. 75–1491, 75–1519, 75–1583, 75–2032,
75–2102, 75–2103, 75–2122 and 75–2226.

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 6, 1976.

Decided March 31, 1977.

Michael S. Horne, Washington, D. C., with whom Ernest W. Jennes, Washington D. C., was on the brief, for petitioners in Nos. 75–1491, 75–1519 and 75–1583.

Julian R. Rush, Jr., Counsel F.C.C., Washington, D. C., with whom Ashton R. Hardy, Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel and Raymond L. Strassburger, Counsel F.C.C., Washington, D. C., were on the brief, for respondents.

Carl D. Lawson, Lee I. Weintraub, Laurence K. Gustafson, Robert B. Nicholson and Barry Grossman, Attys., Dept. of Justice, Washington, D. C., also entered appearances for respondent United States of America.

John B. Summers and James J. Popham, Washington, D. C., were on the brief for petitioner in No. 75–2032.

J. Richard Carr and Christopher J. Reynolds, Washington, D. C., entered appearances for petitioner in No. 75–2102.

Michael H. Bader and William J. Potts, Jr., Washington, D. C., entered appearances for petitioner in No. 75–2103.

Joel Rosenbloom, David R. Anderson and Marianne K. Smythe, Washington, D. C., entered appearances for petitioner in No. 75–2122.

James A. McKenna, Jr. and Robert W. Coll, Washington, D. C., entered appearances for petitioners in No. 75–2226.

Curtis T. White, Washington, D. C., entered an appearance for intervenor in No. 75–1491.

Before BAZELON, Chief Judge, LEVENTHAL and MacKINNON, Circuit Judges.

Opinion for the Court filed by Chief Judge BAZELON.

Concurring opinion filed by Circuit Judge LEVENTHAL.

BAZELON, Chief Judge:

Petitioners, CBS Television Network Affiliates Association et al. (CBS Affiliates) and the National Association of Broadcasters (NAB), challenge certain modifications in the network nonduplication rules, 47 C.F.R. § 76.91 et seq., adopted by the Federal Communications Commission following an informal rulemaking proceeding.[1] Although petitioners raise a host of issues, they press most strongly their contention that the decision under review is not a reasoned one due to its silence on several assertedly crucial points. For the reasons expressed below, we find that the Commission has given the problem of network nonduplication protection the requisite "hard look"[2] and do not disturb the modified rules.

## I. BACKGROUND

One attraction of cable television is its ability to import signals from distant stations that cannot be picked up "off the air" on conventional television sets. Importation of distant network programming, however, can injure a local network affiliate by fractionalizing the market for its network offerings. Consequently, in 1962, the Commission initiated rulemaking proceedings to determine whether and to what extent importation of distant signal network programming through microwave-served cable systems should be regulated.[3]

The Commission's decision to adopt *some* nonduplication rule was based on two factors. First, importation of distant duplicative network signals was seen as unfair competition with the local network affiliate. *First Report and Order in Dockets 14895 and 15233,* 38 F.C.C. 683, 704 (1965). Second, this practice threatened the financial viability of local affiliates and to that extent disserved the public interest. *Id.* at 706–7. Stressing that it merely sought to accommodate cable and broadcast service as fairly as then seemed possible, *id.* at 715, the Commission determined that cable systems should in some circumstances be required to carry the signal of local stations[4] and that limitations should be imposed on importation of distant signal network programs, *id.* at 713.

In shaping the specifics of its nonduplication rule, the Commission sought to protect the basic market for an affiliate's network programming, *id.* at 719, while leaving cable systems free to import distant signals in areas between markets, *id.* at 721. The original rule employed signal contours to determine the zone of protection. *Id.* at 719.[5] Under this system, cable systems were required to delete on the request of a local station network programming that duplicated that of the local station where the local station's signal was of a higher quality. Within its Grade A contour, for exam-

---

1. Our review is limited by the Administrative Procedure Act to determining whether the regulations are "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law. . . ." 5 U.S.C. § 706(2).

2. *Greater Boston Television Corporation v. FCC,* 143 U.S.App.D.C. 383, 444 F.2d 841, 851 (1970).

3. 27 F.R. 12586. At that time, the FCC has asserted jurisdiction only over those cable systems that employed microwave facilities. *See* text accompanying note 6 *infra.* Before concluding the proceeding in 1965, the Commission denied an application for a permit to construct microwave facilities to transmit the signals of distant television stations through a cable system, without prejudice to refiling if the applicant promised to provide nonduplication protection. *Carter Mountain Transmission Corp. v. FCC,* 116 U.S.App.D.C. 93, 321 F.2d

359, *cert. denied,* 375 U.S. 951, 84 S.Ct. 442, 11 L.Ed.2d 312 (1963), *aff'ing* 32 F.C.C. 459 (1962).

4. The current so-called "signal carriage" rules are codified at 47 C.F.R. § 76.51 *et seq.*

5. A "city grade signal," the most intense under the Commission's rules, provides a clear signal to the entire community to which the station is licensed. A "grade A contour" is the line at which a good picture may be expected to be available for at least 90% of the time at the best 70% of receiver locations at the outer limits of that service area; a "grade B contour" is the line at which a good picture may be expected to be available for at least 90% of the time at the best 50% of receiver locations. *Clarksburg Publishing Company v. FCC,* 96 U.S.App.D.C. 211, 225 F.2d 511, 516 n. 12 (1955).

ple, a station enjoyed nonduplication protection as to signals of Grade B or lesser quality. Where two stations provided an equally intense signal, neither was entitled to nonduplication as to the other.

Prior to adopting the modifications under review, the Commission reduced the level of network nonduplication protection in several ways while retaining the contour approach. In 1966, when it asserted jurisdiction over all cable systems, it reduced the length of nonduplication protection from fifteen days to one. *Second Report and Order,* Docket Nos. 14895, 15233 and 15971, 2 F.C.C.2d 725, 748–750 (1966). Subsequently, simultaneous protection was substituted for one day protection. *Cable Television Report and Order,* 36 F.C.C.2d 143, 181 (1972).[6] In addition, in 1974 the Commission codified in rule its *de facto* policy of exempting from the nonduplication requirements cable systems having fewer than 500 subscribers. *Report and Order,* Docket 18785, 46 F.C.C.2d 94.

The proceeding which culminated in the orders under review stemmed from a Petition for Rule Making filed by the National Cable Television Association and "the sheer volume and consistency of complaints" regarding the operation of the nonduplication rules from cable operators and subscribers as well as certain members of Congress. *Notice of Inquiry and Proposed Rulemaking,* Docket No. 19995, 46 F.C.C.2d 1164, 1166, 1167 (1974). The cable interests favored abolition or dilution of the nonduplication rules whereas the broadcast interests advocated maintaining or strengthening the rules. On April 3, 1975, the *First Report and Order in Docket 19995,* 52 F.C.C.2d 519 (*First Report*) was published in which the modifications at issue here were detailed. The major revision was substitution of fixed mileage zones of protection for zones based on contour strength. Under the new system, a local station's network programming is entitled to protection within a circle

radiating a specified distance from a fixed reference point in the city to which the station is licensed. A 35 mile radius was chosen for stations serving the 100 largest markets (3850 square miles). A 55-mile radius was chosen for all others (9500 square miles). The Commission also adopted a "dual channel carriage" rule. This rule permits a cable system to carry the network programming of the local station, along with its advertising and identification spots, on two channels: (1) the channel on which it would normally carry such programming, and (2) the channel on which the distant station's programming would otherwise be carried. In addition, the small system exemption was raised from 500 subscribers to 1,000 and a "program overruns" exception was adopted under which nonduplication protection need not be provided during the first hour following the scheduled completion of a live sports event. Recognizing that in some cases the modified rules might provide insufficient protection, the Commission indicated it would grant special relief where a station's ability to serve the public interest was likely to be diminished. *Id.* at 550. The Commission reconsidered the modifications without altering them. *Memorandum Opinion and Order,* Docket Nos. 19996 and 18785, 35 R.R.2d 363 (1975) (*Memorandum Order*).

## II. FIXED 35/55 MILE ZONES OF PROTECTION

The primary reason for substituting fixed mileage zones for contour zones was to eliminate certain problems that had arisen in the administration of the old rules. The Commission cited several such problems. In highly populated areas, contours of stations from different markets commonly overlap. Apart from the resulting confusion in contour priorities, stations with weak signals on occasion ended up with small protected areas as a result of power-

---

**6.** Because of regional peculiarities, one day protection was retained in the Mountain Standard Time Zone. Reconsideration of Cable Television Report and Order, 36 F.C.C.2d 326, 338 (1972). The Commission severed all considera-

tion of rules pertaining to the Mountain Standard Time Zone from the *Orders* under review and will report its conclusion in a subsequent Report and Order in Docket 19995. *First Report* at 522.

ful overlapping signals of relatively distant stations. *First Report* at 541. In addition, since contours do not remain stable, the area of nonduplication protection lacks long-term certainty. *Id.*[7] This uncertainty is compounded by the fact that predicted contours are not always accurate. *Id.* at 542. Such uncertainty, we note, creates problems not only for the Commission, but for broadcasters and cable operators as well. Finally, the contour approach gave stations with greater signal strength[8] a larger zone of protection than weaker stations, regardless of economic need. *Id.* at 541. Thus two stations serving the same market might have radically different zones of nonduplication protection. The rationality of this support for the Commission's decision to switch to *some* system of fixed mileage protection is unchallenged.

■ Nor do the petitioners claim that the choice to adopt 35 and 55 mile zones was arbitrary.[9] The 35 mile radius chosen for the top 100 markets largely parallels the zones which govern the amended signal carriage rules, *First Report* at 542. The 55 mile radius for smaller markets was chosen to compensate for the more disbursed population patterns in those markets, *Memorandum Opinion* at 369. The Commission decided not to draw larger zones for several reasons. First, larger zones would generate more overlaps of the sort the Commission had sought to eliminate. Furthermore, while the Commission recognized that the 35 mile zone might lead to some diminution of some stations' protection, it concluded that a zone of that size would protect "the heart of a station's market" because it would contain a majority of a station's viewers and ADI counties.[10] *Id.* Again, petitioners do not directly challenge this assessment. Where this is not so, and where a diminution of "[the] station's ability to serve the public interest" therefore appeared likely to result, the Commission indicated that it would grant additional protection. *First Report* at 550.[11]

Petitioners, however, concerned themselves more with what the Commission left out of its opinion.[12] In essence, they claim that as a result of the Commission's failure to discuss several assertedly key factors, the modified rules are arbitrary and capricious.

The Commission did not explain the relationship it saw between the modified rules

---

7. CBS Affiliates assert that contour variation is not a significant problem in light of the fact that the Commission approves only about 13 "major changes" per year. However, since a major change involves a change in contour coverage areas of at least 50%, this figure does not demonstrate that the Commission's concern is trivial.

8. Greater signal strength may be caused by factors such as antenna height, effective radiated power, advantageous channel assignment and/or antenna location.

9. At various points petitioners refer critically to what they regard as a general cutback in nonduplication rights, but they never actually contend that the mileage figures chosen are unreasonably low. CBS Affiliates does contend that the Commission's refusal to grant stations protection around each of the cities that comprise "hyphenated markets" was arbitrary. The Commission, noting that stations are licensed to only one community, stated it would give "full consideration" to granting special relief where necessary in these markets. *Memorandum Opinion* at 372. On the basis of the statistical evidence presented, we cannot say that the decision to grant two zones of protection in "hyphenated markets" as the exception rather than the rule was arbitrary.

10. The ADI, which stands for Area of Dominant Influence, was designed by the American Research Bureau to reflect advertising markets. Every county is assigned to one of 204 ADI's nationwide.

11. In accordance with its declaration that it would not treat waiver requests harshly, the Commission has granted special relief to several licensees. *Compare* WHAG-TV, 56 F.C.C.2d 127 (1975); and Holsum, Inc., 58 F.C.C.2d 1075 (1976) *with* WCEE-TV, Inc., 56 F.C.C.2d 123 (1975), *reconsid. denied,* 59 F.C.C.2d 540 (1976); and WTVY, Inc., 57 F.C.C.2d 401 (1975).

12. In fact, only CBS Affiliates actually challenged the rationality of the modifications. Some, though not all, of the points raised in this regard have been discussed—the others are unpersuasive as well. Also, much of the discussion overlooks the fact that the modified zones embody not one, but two distinct policy choices; namely, (1) switching to fixed zones, and (2) determining the size of the zones.

and its stated policy that unlimited distant signal importation constitutes unfair competition. Consequently, petitioners assert, the Commission has either abandoned or disregarded one of the primary supports for the 1965 rules. This argument misconceives the role unfair competition has played in the development of nonduplication policy. In 1965, the Commission concluded as a policy matter that unlimited distant signal importation would constitute an inherently unfair method of competition. The Commission decided, however, not to ban such importation entirely. Indeed, it concluded that distant signal importation could serve the public interest so long as it did not threaten the viability of local stations. *See e.g.,* 38 F.C.C. at 713. In other words, the Commission's concern was not so much with the "pirating" of signals per se; rather, it was with the broadcasting of those signals in competition with local affiliates. Consequently, the Commission's goal was to establish zones that would protect local affiliates from debilitating economic competition. *Id.* at 713–15.

■ Thus the Commission's failure to discuss explicitly the issue of unfair competition either in deciding to alter the method for charting nonduplication zones or in selecting particular mileage figures is of no consequence. As discussed above, the modified zones, like the original ones, are designed to protect the local affiliate from debilitating economic competition. The Commission has not altered its basic protective policy. Had it done so, it would, of course, have had to explain why. *Greater Boston Television Corp. v. FCC,* 143 U.S. App.D.C. 383, 444 F.2d 841, 852 (1970).

■ Petitioners also claim that the Commission has failed to consider the relation of the modified rules to certain "related and ongoing" Commission policies. In particular, petitioners contend that it was the availability of nonduplication protection out to the grade B contours that provided the sole support for the Commission's 1972 decision to relax the restrictions on distant signal importation. They argue that it was, therefore, arbitrary for the Commission to "drastically" reduce the extent of nonduplication protection without making findings on the impact of that reduction on the importation rules.

There are several difficulties with this argument. To begin with, petitioners do not detail the types of findings they believe would have improved the Commission's decision-making process. Nor is it clear that the old nonduplication rules were the exclusive predicate for relaxing the distant signal rules.[13] More fundamentally, petitioners are incorrect in asserting that the Commission has "drastically" cut back nonduplication protection—indeed some stations will enjoy *larger* zones of protection. And the Commission believes that even though the size of the zones enjoyed by many stations will be reduced, there will be no reduction in effective protection in most of these cases. Lastly, the Commission recognized that its nonduplication and distant signal rules serve a common purpose.

> The network duplication rules—in conjunction with our signal carriage rules—constitute the primary means of protecting local network affiliated stations, and thereby our basic conventional television allocations policies, from the potentially harmful effects of unrestricted cable carriage of distant signals.

*Memorandum Order* at 6. Before modifying the nonduplication rules, the Commission determined that the modifications would not threaten this common underlying purpose.

---

**13.** Petitioners support this proposition with a sentence from the *First Report,*

> The availability of network nonduplication beyond the 35-mile zone out to the grade B contour was the predicate for the Commission's decision to permit unlimited importation of distant signals outside the 35-mile zone and to limit syndicated programming exclusivity rules to the top 100 markets.

52 F.C.C.2d at 539. In fact, the paragraph from which this sentence is quoted describes not the Commission's views, but the comments filed by broadcasters. Furthermore, the petitioners do not support this proposition with any statements from the Commission.

■ Finally, petitioners contend that the Commission erred in failing to consider the anticipated growth of cable service prior to modifying the nonduplication rules, as it had on other occasions. Again, we find this argument unpersuasive. It is true that the Commission took note of the rate of cable growth in deciding to adopt its original nonduplication rules. In light of the pattern of "explosive" cable growth that had developed, the Commission could not rely on natural factors to ameliorate the threat of economic harm posed by distant signal importation.[14] However, the rate of cable growth had little relevance in the Commission proceeding under review. The market of a local station for its network programs will not be affected by cable growth within the zone chosen because it is entitled to nonduplicaton protection in that area. Similarly, the growth of cable outside the zone will not injure a station, so long as the zone adequately encompasses its basic market. Consequently, we find no infirmity in the Commission's failure to discuss anticipated cable growth.[15]

Since we find no reason to disturb the Commission's modified rules,[16] the petitions to review are denied.

LEVENTHAL, Circuit Judge, concurring:

I concur in the opinion of the majority, but I would be more explicit in acknowledging the likely impact of the change in rules. Petitioners complain that the FCC has taken action to expand the economic position of cable TV, and to diminish the protection afforded the network affiliates. This may well be the dominant effect of the changes, even though in some particulars and in some applications the amendments provide somewhat more protection to the affiliates. Assuming this is so, petitioners might be able to complain that there is no justifica-

tion for the changes, even though they might not have been able to complain of the present rules if they had been adopted in the first instance.

But the difficulty they face is that the FCC has advanced reasons for the changes which we cannot say are inconsistent with reasoned decisionmaking. The change from contours to fixed mileage zones is predicated on ease of administration and simplification. Simplification is an objective for which we all strive—unless it works to our economic disadvantage. Certainly, however, the courts cannot upset an administrative effort toward simplification, at least in the absence of a showing of grievous injury. As to that, the FCC has promised an attentive consideration to applications for special relief that will operate, together with the new basic rules, to achieve a total impact that is reasonable overall.

A feature not discussed by the majority that troubles me is the objection that the new dual carriage rules have dropped the requirement that the cable caster black out duplicative network programming. He now will have the right to carry the program being carried by his local network affiliate on both the regular and distant channels. The local station is hurt if the audience views the program on a distant channel, because of the tendency to stay with that (distant) channel when the program ends. But the policy choice is a close one. The new rule avoids the dissatisfaction of home viewers complaining over the necessity of changing channels, mid-program blackouts, etc. Given the continuing orientation of FCC to provide reasonable protection to local stations and affiliates of networks, the decision to advance viewer satisfaction cannot be assailed as impermissible.

The new rules may, indeed, work a substantial shift in economic position, but it is

14. *See, e.g.,* First Report and Order, Dockets Nos. 14895, and 12533, 38 F.C.C. 683, 710–714 (1965).

15. In any event, predicting the rate of future cable growth would be exceptionally difficult. *1972 Order,* 36 F.C.C.2d at 168–169.

16. CBS Affiliates contend that certain of the other modifications are deficient as well. We find these arguments unpersuasive.

not one that the courts can reassess on the ground of lack of reasoned decisionmaking. The choices are within the latitude of regulatory power that Congress has delegated to the Commission.