**RETAIL STORE EMPLOYEES UNION, LOCAL 880, RETAIL CLERKS INTERNATIONAL ASSOCIATION, AFL–CIO, Appellant,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellee.**

No. 22605.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 24, 1969.

Decided Oct. 27, 1970.

Mr. Joseph E. Finley, Washington, D. C., for appellant.

Mr. D. Biard MacGuineas, Counsel, Federal Communications Commission, for appellee. Messrs. Henry Geller, Gen. Counsel, Federal Communications Commission, John H. Conlin, Associate Gen. Counsel, and Bernard C. O'Neill, Jr., Counsel, Federal Communications Commission, were on the brief, for appellee. Mrs. Lenore G. Ehrig, Counsel, Federal Communications Commission, also entered an appearance for appellee.

Before BAZELON, Chief Judge, and ROBINSON and ROBB, Circuit Judges.

BAZELON, Chief Judge:

This is an appeal, 47 U.S.C. § 402(b) (6), from a memorandum opinion and order of the Federal Communications Commission renewing without hearing the broadcasting license of Radio Station WREO of Ashtabula, Ohio, over the protest of Retail Store Employees Local 880 (Union).[1] We conclude that the Commission has failed to demonstrate adequate consideration of issues of substantial public importance, and accordingly remand the case to the Commission for further proceedings.[2]

## I.

This case arises out of a labor-management dispute not involving WREO. Hill's Department Store of Ashtabula,

---

1. Radio Enterprises of Ohio, Inc., 14 P & F Radio Reg.2d 780 (December 2, 1968).

2. *See* parts II–IV, *infra.*

Ohio, (Hill's Ashtabula) is one of a chain of such stores in northeastern Ohio and southwestern Pennsylvania operated by the Shoe Corporation of America. In April 1965, appellant Union was certified by the National Labor Relations Board as the bargaining agent for employees of Hill's Ashtabula.[3] Late in that year or early in the next,[4] after some months of bargaining, the Union determined to seek its objectives by going on strike. Hill's Ashtabula was struck, and a boycott beginning there spread to other Hill's stores in the area, including Youngstown, Warren, and Sandusky, Ohio.

During this period, Hill's regularly purchased radio air time for advertising. Although no samples of Hill's advertisements are before us, the parties are agreed that the advertising was standard commercial copy, extolling the virtues of Hill's stock, bargains, and service, and on that basis urging listeners to patronize the various Hill's outlets. Seventy such announcements were run by WREO between January 10 and February 22, 1966. Similar copy was carried by stations WFMJ of Youngstown, WHHH of Warren, and WLEC of Sandusky. Beginning in February, 1966, the Union undertook to support its boycott by purchasing time for one-minute spot announcements stating that a strike was in progress against Hill's Ashtabula, and urging listeners to respect the picket lines at that and the other Hill's Department Stores.[5] Three hundred and twenty-two such announcements were carried by WREO between February 16 and April 7, 1966. In addition, WFMJ of Youngstown carried two such spot announcements (both on March 22), and WLEC of Sandusky carried one hundred and seventy such announcements from February 23 through March 28.[6] WHHH of Warren, Ohio, although approached by the Union, refused to accept any of the Union's advertisements upon the advice of its counsel that "no fairness question was presented"[7] and that the station was therefore not compelled to run the proffered advertisements.

As the spring wore on, however, the Union experienced more and more difficulty in purchasing air time for its advertisements. Despite continuing attempts by the Union, through an advertising agency, to purchase further time, by early April of 1966 it could find no station serving the area around Ashtabula willing to run its advertisements. Apparently the last of the stations to cancel was WREO of Ashtabula, which on April 5 wrote the advertising agencies representing the Union and Hill's Ash-

---

3. The Record does not indicate whether the Union represents employees at other Hill's outlets.

4. The record is not clear on this point.

5. One such announcement, agreed by the parties to be typical, ran as follows:

   *Announcer*: Here is an important message from *Retail Store Employees Union Local 880*—regarding the picket line now at *Hill's Department Store* in Youngstown. The picket line is in support of the strike at *Hill's Department Store* in Ashtabula. This strike now in progress at *Hill's* comes after seven months of continuous negotiations, during which no agreement has been reached between the Retail Store Employees Union Local 880—and the management of HILL'S DEPARTMENT STORE. Important issues still unresolved include Union Security, Arbitration and Grievance Procedure, Health and Welfare, Funeral Leave, and Visitation Rights to the store. These, and other issues are vital to the betterment of the store employees working conditions. *Some* Hill's employees are still working because if they *all* go out—the Company would try to replace them with non-union help who could be granted a vote in subsequent elections. The 2,000 members of Retail Store Employees Union Local 880 request that *all* union members, their families and friends observe and respect the picket line now at HILL'S DEPARTMENT STORE.

6. Although the record is not clear in this regard, it appears that some spot announcements were also carried by other stations in northeastern Ohio and northwestern Pennsylvania.

7. In re Application of WFMJ Broadcasting Co., 14 F.C.C.2d 423, 426 (1968) (concurring and dissenting opinion of Commissioner Johnson).

tabula to inform them that WREO "would accept no further commercial copy from either party concerning the strike between Hill's and the union." [8] Subsequently, after counsel for the Union informed WREO that he had filed a complaint regarding this action with the FCC, the station on April 22 offered free time to both parties for a single "round table discussion" of the issues presented by the strike.[9] This offer was never accepted by either party.

Some time in April, the Union filed complaints with the FCC, charging "various Ohio and Pennsylvania radio stations" [10] (including WREO) with violations of the fairness doctrine. The Commission, in an unreported letter of April 29, 1966, "found no controversial issue of public importance involved in the factual situation and * * * pointed out that a broadcaster is not a common carrier in the sense that he must accept advertising from all comers. * * * " [11] About the same time, the Union formally charged Hill's with a violation of the National Labor Relations Act for exerting economic pressure against some of these radio stations to persuade them to cancel the Union's advertising. This charge was ultimately rejected by the National Labor Relations Board's Office of Appeals on March 14, 1967.[12]

In the meantime, WREO continued to broadcast advertisements for Hill's Ashtabula. One hundred and twenty-three announcements and six sponsored programs were run during the month of April, and from April 1 to the end of the year, the station broadcast 1,088 spot announcements, 176 sponsored programs, and fourteen sponsored one-third segments of football games on behalf of the store.[13] Similarly, it appears that advertising on behalf of Hill's continued to be broadcast by WFMJ, WHHH, and WLEC.[14] Accordingly, on August 9, 1967, the Union filed with the FCC unverified [15] petitions to deny renewal of the licenses of stations WFMJ, WHHH, WLEC, and WREO. The petitions alleged that the stations had succumbed to economic pressure from Hill's and therefore cancelled the Union's strike advertising; and that, in any event, refusal to carry advertising by the Union while continuing to carry advertising from Hill's urging listeners to patronize its stores was a violation of the fairness doctrine. The FCC wrote each of the affected stations inquiring, *inter alia,* why Union advertising had been rejected.[16] After receiving replies to its inquiry,[17]

---

8. Letter from Radio Station WREO to counsel for the Union, April 22, 1966.

9. *Id.*

10. In re Application of WFMJ Broadcasting Co., *supra* note 7 at 424. The present record does not indicate precisely which stations were charged, and the FCC's response is apparently unpublished. *See* note 11 *infra.*

11. In re Application of WFMJ Broadcasting Co., *supra* note 7 at 424. We have been unable to find any indication that this letter has been published, and it is not part of the record before us. Accordingly, we have inferred its contents so far as possible from the majority opinion in WFMJ, *supra.*

12. Letter from the NLRB to Edward W. Hummers, Jr., Esq., August 17, 1967.

13. These figures are compiled from WREO's response to an inquiry by the FCC. If, as seems likely, the response contains a typographical error, the correct figures would be 1,190 announcements, 74 programs and 14 thirds of football games.

14. The record is not clear on this point.

15. *See* 47 U.S.C. § 309(d) (1) (1964). On September 12, 1968, counsel for the Union verified the petition to deny renewal of WREO's license.

16. The only letter in the present record is that sent to WREO. It appears, however, that essentially identical letters were sent to the other stations. The letters also requested information regarding the number of advertisements of Hill's and the Union that were broadcast by each station.

17. WFMJ indicated that it investigated the local import of the strike in Youngstown, the city primarily served by the station, and discontinued the advertisements only after it concluded that the issue was not of importance there. WLEC of Sandusky carried 170 union advertisements and discontinued them

the Commission in a memorandum opinion and order [18] denied the Union's petitions regarding WFMJ, WHHH, and WLEC. The Commission, apparently relying upon its letter to the Union of April 29, 1966,[19] found no fairness question presented. With regard to the Union's charges of economic pressure, the Commission noted that similar charges had been rejected by the National Labor Relations Board after investigation;[20] that each of the three stations had categorically denied that any such pressure had been exerted against them; and that the Union had provided no specific allegations of particular economic pressure exerted against any of the stations.[21] Accordingly, the Commission denied the petitions and granted the stations' request for renewal.[22] No appeal was taken from that decision.

Action on the Union's petition regarding WREO was deferred pending "further inquiries" by the Commission.[23] Subsequently, the Commission wrote the Manager of Hill's Ashtabula requesting a statement regarding "your part, if any" in the controversy between the Union and WREO, and asking him to state "whether Hill's, or any of Hill's employees or agents, at any time during 1966 sought to influence WREO directly or indirectly to cancel spot announcements by Local 880 concerning the Ashtabula strike."[24] The manager replied that no such efforts had been made by the store.[25] In addition, the Commission requested further information from WREO regarding its "policy" decision to cancel the Union's advertising, and regarding a conversation between the station manager and Hill's advertising agency at which the agency representative had contended that "some of the ads of Local 880 were possibly illegal."[26]

Shortly thereafter, WREO replied. It categorically denied that any agent of

only after determining that Hill's Sandusky store would not be struck. WHHH, upon being informed by its counsel that no fairness question was presented, never ran any Union advertisements.

18. In re Application of WFMJ Broadcasting Co., *supra* note 7.

19. *See* notes 10–11 *supra* and accompanying text.

20. *See* note 12 *supra* and accompanying text. The scope of the NLRB's investigation of the charges does not appear in the present record, but it does appear that the NLRB's rejection was based upon its conclusion that the allegations of economic pressure were unfounded.

21. In re Application of WFMJ Broadcasting Co., *supra* note 7 at 424.

22. The Commission's reasoning on this point is not entirely clear, for the factors relied upon by the Commission to support its rejection of the Union's petitions regarding these stations would apply equally well to WREO. As noted immediately below, however, renewal of WREO's license was deferred pending further investigation. The true reason for the distinction would seem to be that indicated in the concurring and dissenting opinion of Commissioner Johnson, who pointed out that the stations whose licenses were initially renewed had provided full explanations for their actions,

*see note 17 supra*, while WREO had merely relied upon unspecified "reasons of policy." *See* In re Application of WFMJ Broadcasting Co., *supra* note 7 at 426–427.

23. *Id.* at 423 n. 1 (majority opinion).

24. Letter to Manager, Hill's Department Store, from the FCC, August 21, 1966.

25. The full text of the Manager's reply is as follows:
In reply to your letter of August 21, 1968, please be advised that this store did not at any time seek to influence Radio Station WREO to cancel announcements by RCIA local #880 concerning its strike against this store.

26. Letter to WREO from the FCC, August 21, 1966. The characterization of the conversation is from WREO's previous response to the Commission's inquiries. Commissioners Lee and Wadsworth dissented to issuance of the letter and noted that they would grant the license renewal without further argument or investigation.
The FCC, on the same date, also wrote Local 880 requesting that its petition to deny be verified and asking whether the Local had had any conversations with Hill's regarding cancellation of Union advertising. The Union's counsel replied that they had neither records nor memory of any such conversations.

Hill's at any time during 1966 sought to influence WREO concerning the cancellation of the Union's advertising. It explained the conversation regarding the "possibly illegal" Union advertisements as an uninfluential, isolated remark made during the course of a normal sales call.[27] With regard to the station's decision to cancel the Union's advertising, the letter provided the following explanation:

> WREO has been operating as an independently owned radio station since 1937. During these years we afforded the public a service compatible with good taste and minimal irritation. We never permitted ourselves to be influenced or coerced in the use of air time.
>
> Our policy also has been to avoid airing private controversies since statements might be made of a possibly damaging nature to persons or businesses, and as a generality such controversies were of a private and not of a public interest.
>
> WREO had carried about 322 of Local 880's announcements when it became apparent, from complaints of the public, that the continuous repetition of these partisan announcements had become an irritant to WREO's listening audience. The advertisements concerned a controversy in which the public and WREO were not a part of [sic].

We therefore notified both parties that we would accept no more announcements concerning the strike.

The Union then sent a letter to WREO and stated that the public had a right to have information concerning this private labor dispute.

WREO bent over backwards then to offer the union free time on the air at a WREO sponsored round table to discuss the labor dispute with Hill's, so if there was any possible public interest the matter could be heard. The union did not accept this opportunity.

This response appeared to satisfy the Commission. On December 2, 1968, it released a Memorandum Opinion and Order [28] in which it found "no unresolved questions of fact remaining," [29] and therefore no necessity for a hearing. It accepted Hill's and WREO's denials of improper influence, noting that the Union had come forward with no further factual material to support its allegations. As to the Fairness Doctrine aspect of the Union's claim, the Commission noted that WREO "has presented the [Union's] advertisements," and that after refusing to accept further copy on the subject it nevertheless offered free air time for a roundtable discussion. "In the circumstances," the Commission concluded, "there is no need to consider further issues under the fairness doctrine." [30] From this decision the Union appeals.

27. In full, the station's response reads:
   In our opinion, neither Hill's nor Mr. Moore [a representative of Hill's advertising agency] sought to influence WREO and we did not interpret Mr. Moore's remarks as an attempt to influence WREO. WREO did not cancel Local 880's ads because of or as a result of Mr. Moore's remarks. They were cancelled because and for the reason we gave in our answer to Question No. 2 [quoted in text immediately above]. The date of the Moore-Fassett [a representative of the station] conversation was approximately March 31, 1966. To our knowledge, Local 880 spots were not discussed at more than this conversation. The Moore-Fassett "meeting" was a telephone conversation instituted by Mr. Fassett in the course of a normal sales call. No meeting was arranged by either party.

28. Radio Enterprises of Ohio, Inc., 14 P & F Radio Reg.2d 780 (December 2, 1968). Commissioners Cox and Johnson dissented, Commissioner Johnson at least presumably on the basis of his separate opinion in In re Application of WFMJ Broadcasting Co., *supra* note 7. Commissioner Wadsworth, who was absent, did not participate.

29. Radio Enterprises of Ohio, Inc., *supra* note 28 at 782.

30. *Id.* at 781–782. Nevertheless, the Commission did consider the matter further, stating that "we hold that WREO's refusal to accept additional ads from Local

## II.

■■ We have previously had occasion to point out that the Federal Communications Commission was intended by Congress to function as far more than a mere referee between conflicting parties.[31] Regardless of the formal status of a party, or the technical merits of a particular petition, the FCC "should not close its eyes to the public interest factors" raised by material in its files.[32] We have noted that, as a general matter, the federal regulatory agencies should construe pleadings filed before them so as to raise rather than avoid important questions. They "should not adopt procedures that foreclose full inquiry into broad public interest questions, either patent or latent." [33]

■■ As a rule, "an administrative approval without the benefit of a hearing is to be avoided." [34] As we said in Clarksburg Publishing Co. v. FCC,[35]

The statute contemplates that, in appropriate cases, the Commission's inquiry will extend beyond matters alleged in the protest in order to reach any issue which may be relevant in determining the legality of the challenged grant.[36] Clearly, then, the inquiry cannot be limited to the facts alleged in the protest where the Commission has reason to believe, either from the protest or its own files, that a full evidentiary hearing may develop other relevant information not in the possession of the protestant.[37]

■■ We need not here decide whether the Union's allegations that improper economic pressure had been exerted upon WREO to cause it to cancel Union advertising raises an issue of "such overriding public interest that the Commission would have been bound to consider [it] on its own initiative." [38] We are convinced, however, that on the present record something more than summary treatment of the Union's allegations was required.[39] The Union's

880 after April, 1966 was, for the reasons advanced by the Station, within the proper limits of its discretion," citing McIntire v. William Penn Broadcasting Co., 151 F.2d 597 (3d Cir. 1945). Radio Enterprises of Ohio, Inc., *supra* note 28 at 782.

31. *See, e. g.,* L. B. Wilson, Inc. v. FCC, 130 U.S.App.D.C. 156, 397 F.2d 717 (1968); Citizens TV Protest Co. v. FCC, 121 U.S.App.D.C. 50, 348 F.2d 56 (1965); Mansfield Journal Co. v. FCC, 86 U.S.App.D.C. 102, 180 F.2d 28 (1950).

32. Southwestern Publishing Co. v. FCC, 100 U.S.App.D.C. 251, 254, 243 F.2d 829, 832 (1957).

33. Midwestern Gas Transmission Co. v. FPC, 103 U.S.App.D.C. 360, 368, 258 F.2d 660, 668 (1958).

34. City of Portland, Oregon v. FMC, 139 U.S.App.D.C. 344, 345, 433 F.2d 502, 503 (1970).

35. 96 U.S.App.D.C. 211, 215, 225 F.2d 511, 515 (1955).

36. The statute here referred to was § 7 of the Act of July 16, 1952, ch. 879, 66 Stat. 715, *amending* 47 U.S.C. § 309. The statute in its present form is found in 47 U.S.C. § 309(e) (1964). We have previously noted that the statement in text, "made in 1955, is not affected by the

1962 amendments to 47 U.S.C. § 309." Citizens TV Protest Committee v. FCC, 121 U.S.App.D.C. 50, 53 n. 13, 348 F.2d 56, 59 n. 13 (1965).

37. *See also* 47 U.S.C. § 403 (1964), which provides *inter alia* that "The Commission shall have full authority and power at any time to institute an inquiry, on its own motion, in any case and as to any matter or thing concerning which complaint is authorized to be made, to or before the Commission by any provision of this chapter, or concerning which any question may arise under any of the provisions of this chapter."

38. Citizens TV Protest Committee v. FCC, 121 U.S.App.D.C. 50, 53, 348 F.2d 56, 59 (1965).

39. In its brief in this court, the FCC has pointed out that the Union's charges were investigated, and rejected on factual grounds, by the National Labor Relations Board. The Commission's Memorandum Opinion and Order denying the Union's petition does not appear to rely upon this investigation, which is not mentioned in the opinion. We recognize, however, that when one federal agency has rejected factual charges after an adequate investigation a sister agency may be entitled to rely upon the prior investigation in dismissing factually identical allegations

claim that no radio station serving Ashtabula would carry its advertisements stands undisputed. It can hardly be said that the proffered advertisements were objectionable on their face.[40] WREO had, in fact, carried 322 such announcements without any apparent hesitation. Nothing in the record suggests that mere repetition was the basis for discontinuing the advertisements, and the station did not offer to broadcast a more limited number of spot announcements, or suggest to the Union that it change its copy more frequently than had been its practice. Moreover, in the nine months following cancellation WREO broadcast more than a thousand spot announcements for Hill's Ashtabula, an average of over one hundred per month.

Nor can we or the Commission be oblivious of the attitudes of other stations in the area.[41] It strikes us as curious, at least, that the general attitude of enterprises whose very existence was dependent upon advertising revenues appears to have been that the proffered advertising would be rejected unless the public interest *compelled* its presentation.[42]

Certainly these circumstances may validly be considered as giving rise to a justifiable suspicion that something might have been amiss. Viewed against this background, we cannot say that the responses of Hill's Ashtabula[43] and WREO[44] satisfactorily disposed of the matter. Explaining is decision to cancel the Union's advertisements, WREO merely stated that it had become "apparent, from complaints of the public, that the continuous repetition of these partisan announcements had become an irritant to WREO's listening audience."[45] The station never undertook to explain how many complaints it had received, or from whom they came; whether complaints had been received regarding other advertisements carried by the station; whether its general policy was to cancel all advertising that was the subject of some listener complaints; or whether the public's objections might have been cured by less frequent broadcasting of the announcements, or more frequent changes in the Union's copy.

In light of these ambiguities in the station's response, some further investigation was certainly necessary. It may well be that, with proper use of the discovery mechanisms available in such matters,[46] an adequate record can be made without the necessity for a full-dress evidentiary hearing.[47] We hold only that, on the present record, the undisputed facts raise questions adequately answered neither by the station's ex-

---

without hearing. In such cases, however, at the very least the record must demonstrate that the previous investigation was adequate.

40. See the sample advertisement quoted in note 5 *supra*.

41. *See* note 17 *supra*.

42. Although WREO ultimately explained its decision as resulting from listener complaints, no hint of this basis appears in its letter of April 22, 1966, to counsel for the Union. In this letter the only basis stated for the decision is that "The station management felt as a matter of policy we would have no further part in the controversy * * *." Explanations of the other stations' position appear in note 17 *supra*.

43. *See* note 25 *supra*.

44. *See* note 27 *supra* and accompanying text.

45. The explanation is quoted in full on page 8 *supra*.

46. *See* 47 C.F.R. §§ 1.311–.325 (1970).

47. It appears that the discovery mechanisms referred to in note 46 *supra* are available only once a case is set for hearing. *See* 47 C.F.R. § 1.311 (1970). The statute, of course, requires that any hearing on a petition to deny renewal "shall be a full hearing in which the applicant and all other parties in interest shall be permitted to participate." 47 U.S.C. § 309(e) (1964). It does not, however, appear to foreclose cancellation of the hearing if prehearing discovery resolves all relevant factual disputes.

planations nor by the Commission's opinion.[48] In these circumstances, we cannot say that the renewal of WREO's license is properly supported by the record.

### III.

We are likewise concerned by the Commission's summary treatment of the fairness question.[49] Since the case is to be remanded in any event, there is no need for a full discussion of the question here. But in light of the inadequacy of the Commission's opinion on this point, we believe it wise to provide a brief indication of some of the issues the Commission should face in this regard upon remand.[50]

A. Since its inception, federal regulation of radio and television broadcasting has been premised in large part upon the assumption that physical factors unique to this means of communication make both appropriate and necessary special means of regulation that will take into account the particular characteristics of the medium. The limited number of channels available for broadcast, and the possibility of interference among neighboring stations, of necessity required restrictions upon persons seeking to make use of the airwaves.

These restrictions could, perhaps, have been limited to technical matters: allocation of broadcast frequencies, transmitter power, and the like. This, however, has not been the case. Instead, the Commission has interpreted its statutory mandate to insure that broadcasting serves the "public interest, convenience, and necessity" [51] as authority for at least limited regulation of the content of broadcast material.[52] The bulk of this regulation has been subsumed under the Commission's "fairness doctrine." Simply stated, the doctrine requires each broadcaster to afford "reasonable opportunity for the presentation of contrasting viewpoints on controversial issues of public importance." [53]

---

48. In this regard we would emphasize that, even assuming that Hill's Ashtabula made neither direct nor indirect suggestions that Union advertising be cancelled, there remains the question whether WREO's action was nevertheless motivated by a desire to gratify the unspoken wish of what appears to have been a major advertising client. A favor need not be solicited to be improper.

49. The Commission found that, since WREO had presented some of the Union's advertisements, had refused to accept copy regarding the strike from either party, and had offered free time for a roundtable discussion of the issues, there was "no need to consider further issues under the fairness doctrine." No authority was cited for this statement; cf. The Evening News Association, 6 P & F Radio Reg. 283 (April 21, 1950). Nevertheless, the Commission further held that "WREO's refusal to accept additional ads from Local 880 * * * was, for the reasons advanced by the Station, within the proper limits of its discretion," citing McIntire v. William Penn Broadcasting Co., 151 F.2d 597 (3d Cir. 1945). Since *McIntire* merely held that regulation of program content was within the province of the Commission rather than the district courts, the citation can hardly be regarded as illuminating.

50. With commendable candor, the Union on this appeal has stated its belief, that, even if a violation of the fairness doctrine has occurred, this single violation in the circumstances of this case would not warrant denial of WREO's application for renewal of its license. Should the Commission agree, and should it find upon proper investigation that WREO's cancellation of Union advertising was otherwise not improper, it might wish to consider the advisability of separating the question of WREO's compliance with the fairness doctrine from the license renewal proceedings. *See* 47 U.S.C. § 312(b) (1964); 5 U.S.C. § 554(e) (Supp. V, 1970).

51. *See, e. g.,* 47 U.S.C. § 309(a), (d) (1964).

52. For a critique of this result, *see* Blake, Red Lion Broadcasting Co., v. FCC: Fairness and the Emperor's New Clothes, 23 Federal Communications Bar Journal 75 (1969).

53. Applicability of the Fairness Doctrine in the Handling of Controversial Issues of Public Importance, —— Fed.Reg. ——, ——, 2 P. & F Radio Reg.2d 1901, 1904 (1964).

■ As the doctrine has developed, its central purpose has become increasingly clear. That purpose has been to insure both that the listening public is presented with information regarding controversial issues of public importance,[54] and that facts, analysis, and argument supporting all reasonable positions on a given issue are aired by the broadcasters.[55] That is, central to the fairness doctrine is the promotion of informed decision-making by the public by insuring that the facts and arguments relevant to decision are made available to the listening audience.

If this were the whole of the doctrine, it might well be that no substantial question would be raised by WREO's denial of air time to the Union for its advertisements. More than three hundred spot announcements had been broadcast by the station in less than two months. Taking the sample before us [56] as typical, the advertisements merely stated that a strike was in progress, listed the issues in dispute but without giving any indication of the positions of the opposing parties, and urged without giving any reasons that listeners support the Union by boycotting Hill's Department Stores. It is difficult to see how repetition of this or similar copy would add to public knowledge, except perhaps that each repetition of the advertisement would inform the public that the strike was still in progress—information that we may well assume was sufficiently presented by regular broadcasts of local news.

■ But the Supreme Court,[57] this court,[58] and the Commission itself have all recognized that the fairness doctrine is not an island whole unto itself. It is merely one aspect of the Commission's implementation of the requirement that broadcast stations serve the public "interest, convenience, and necessity." Accordingly, although as a general matter equal time is not required so long as a reasonable opportunity is afforded for the presentation of opposing viewpoints,[59] the Commission has upon occasion recognized that time, rather than information, is of the essence. Thus, in regard to broadcast spot announcements soliciting campaign contributions, the Commission has recognized that at least with regard to two major party candidates, "fairness would obviously require that these two be treated roughly the same with respect to the announcements." [60] Presumably, the additional *information* presented to the public by repeated announcements would be minimal; the value of repetition would be solely in the additional coverage obtained.[61] Similarly, in Times-Mirror,[62] a station had aired more than 20 broadcasts by commentators favoring one major-party candidate for governor, and 2 broadcasts by commentators favoring his opponent. Summarizing its ruling,

54. *See, e. g.*, Letter to WSOC Broadcasting Co., 17 P & F Radio Reg. 548, 550 (July 16, 1958) (fairness doctrine applies regardless of coverage of issue by other media) ; Letter to Cullman Broadcasting Co., 25 P & F Radio Reg. 895 (September 18, 1963).

55. John J. Dempsey, 6 P & F Radio Reg. 615 (1950) ("broadcast licensees have an affirmative duty generally to encourage and implement the broadcast of all sides of controversial public issues * * * over and beyond their obligation to make available on demand opportunities for the expression of opposing views.").

56. Note 5 *supra*.

57. Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 379–380, 89 S.Ct. 1794, 23 L. Ed.2d 371 (1969).

58. Banzhaf v. FCC, 132 U.S.App.D.C. 14, 23–28, 405 F.2d 1082, 1091–1096 (1968), cert. denied, American Broadcasting Companies v. F.C.C., 396 U.S. 842, 90 S.Ct. 50, 24 L.Ed.2d 93 (1969).

59. *E. g.*, Honorable Charles L. Murphy, 23 P & F Radio Reg. 953 (1962).

60. Letter to Lawrence M. C. Smith, 25 P & F Radio Reg. 291 (April 18, 1963).

61. That is, since not all of a station's audience is normally listening to broadcasts at any one time, repetition increases the likelihood that a given message will be heard by any individual, and may also increase its impact on those hearing the message more times than one.

62. 24 P & F Radio Reg. 404 (1962).

the Commission stated that "[t]he continuous, repetitive opportunity afforded for the expression of the commentators' viewpoints on the gubernatorial campaign, in contrast to the minimal opportunity afforded to opposing viewpoints, violated the right of the public to a fair presentation of views." [63] Most recently, in the Commission's landmark ruling on cigarette advertising,[64] the Commission stated:

> We think that the frequency of the presentation of one side of the controversy is a factor appropriately to be considered in our administration of the Fairness Doctrine. * * * For, while the Fairness Doctrine does not contemplate "equal time", if the presentation of one side of the issue is on a regular continual basis, fairness and the right of the public adequately to be informed compels the conclusion that there must be some regularity in the presentation of the other side of the issue.[65]

In the present case, it seems clear to us that the strike and the Union boycott were controversial issues of substantial public importance within Ashtabula, the locality primarily served by WREO. The ultimate issue with regard to the boycott was simple: whether or not the public should patronize Hill's Ashtabula. From April through December, Hill's broadcast over WREO more than a thousand spot announcements and more than a hundred sponsored programs explaining why, in its opinion, the public should patronize its store. During that same period, the Union was denied any opportunity beyond a single roundtable broadcast to explain why, in its opinion, the public should not patronize the store. We need

not now decide whether, as the Union would have us hold, these facts make out a *per se* claim of a violation of the fairness doctrine. We do believe, however, that the question deserves fuller analysis than the Commission has seen fit to give it.

B. Central to the Union's argument on this point is the proposition that, in urging listeners to patronize Hill's Ashtabula Department Store, Hill's advertisements presented one side of a controversial issue of public importance. Hill's copy, of course, made no mention of the strike or boycott, or of the unresolved issues between the Union and the store. But the advertisements did urge the listening public to take one of the two competing sides on the boycott question —they urged the public to patronize the store, *i. e.*, not to boycott it. It seems to us an inadequate answer to this argument merely to point out that Hill's copy made no specific mention of the boycott. In dealing with cigarette advertising, the Commission has recognized that a position represented by an advertisement may be implicit rather than explicit.[66] And although the Commission repeatedly emphasized that its holding in that case —that stations broadcasting cigarette advertisements must regularly provide free time if necessary for the presentation of arguments opposing cigarette smoking—was limited to cigarette advertising, the reasons advanced by the Commission to support that limitation seem to us not to imply that other advertisements may not carry an implicit as well as an explicit message, but rather that the implicit and explicit messages normally carried by advertising do not concern controversial issues of public importance.[67]

63. *Fairness Primer*, supra note 53 at ——, 2 P & F Radio Reg.2d at 1917–1918.

64. Letter to Television Station WCBS-TV, 8 F.C.C.2d 381, petitions for reconsideration, etc., denied, 9 F.C.C.2d 921 (1967), aff'd *sub nom*, Banzhaf v. FCC, *supra* note 58.

65. 9 F.C.C.2d at 941.

66. Television Station WCBS-TV, 9 F.C.C. 2d 921, 938–939 (1967).

67. Petitioners further assert that the ruling cannot logically be limited to cigarette advertising alone, and hence will have broadscale effect on broadcast operations and the presentation of advertising by radio generally. * * *

[But the] products to which petitioners refer do not present a * * * situation [comparable to cigarette advertising]. The example most uniformly cited is auto safety. But the governmental and

C. The Commission's ruling with regard to cigarette advertising relied heavily upon the judgment of other branches of government that, in light of the possible dangers of smoking "to the health of millions of persons," [68] the question whether or not to smoke cigarettes was one of substantial importance to the public.[69] In its regulation of labor-management relations, Congress has indicated substantial concern with equalizing the bargaining power of employees and their employers.[70] Stripped to its essentials, this dispute is one facet of the economic warfare that is a recognized part of labor-management relations: the Union, in urging a boycott of Hill's Department Stores, was seeking to put economic pressure upon management to accede to its demands; management, on the other hand, was seeking to resist the Union's pressure by continuing profitable operations. Part of the Union's campaign was publicity for its boycott; part of management's arsenal was advertising to persuade the public to patronize its stores.

If viewed in this light, it could well be argued that the traditional purposes of the fairness doctrine are not substantially served by presentation of advertisements intended less to inform than to serve merely as a weapon in a labor-management dispute. But the fairness doctrine, as we have pointed out, is only one aspect of the FCC's implementation of the statutory requirement that broadcast stations operate to serve the public interest.[71] The public policy of the United States has been declared by Congress as favoring the equalization of economic bargaining power between workers and their employers.[72] It is at the very least a fair question whether a radio station properly serves the public interest by making available to an employer broadcast time for the purpose of urging the public to patronize his store, while denying the employees any remotely comparable opportunity to urge the public to join their side of the strife and boycott the employer. If the Union's claim is to be rejected, we believe this question should be dealt with by the Commission.

### IV.

In summary, we believe that the Union's evidence of denial of access to radio air time raised questions regarding possible improper influence by Hill's that were not adequately answered by Hill's bare denial and the station's letter of denial and explanation. With regard to the Union's fairness question, we recognize the primary responsibility of the FCC in assuring that radio broadcasters operate their stations in the public interest. We have not here attempted a full canvass of the issues raised by even a good-faith denial to the Union of access to broadcast time; we have merely sought to indicate some of the questions that must be answered. We do believe, however, that these issues deserve far more comprehensive treatment than was afforded them by the FCC. Accordingly, we remand the case to the Commission for further proceedings consistent with this opinion.

So ordered.

ROBB, Circuit Judge (dissenting):

The case before the Commission began August 7, 1967 when the Union filed a

---

private reports on this matter do not urge the public to refrain from normal use of automobiles in the interest of public safety; rather, the emphasis is on increased safety features * * * and increased care by drivers. Television Station WCBS-TV, 9 F.C.C. 2d 921, 942–943 (1967).

68. *Id.* at 943.

69. *See* Banzhaf v. FCC, 132 U.S.App.D.C. 14, 28–31, 405 F.2d 1082, 1096–1099 (1968).

70. *See* H.R.Rep.No. 669, 72nd Cong., 1st sess. (1931); 29 U.S.C. §§ 102, 151 (1964).

71. *See* notes 57–58 *supra* and accompanying text.

72. "The inequality of bargaining power between employees who do not possess full freedom of association or actual liberty of contract, and employers * * * substantially burdens and affects the flow of commerce * * *." 29 U.S.C. § 151 (1964). *See id.* §§ 102, 159.

petition to deny the renewal of the license of Station WREO. So far as material here the ground of the petition was that the station had violated the Commission's Fairness Doctrine. It was alleged that: After a long campaign the Union organized the retail store employees of Hill's Department Store in Ashtabula, Ohio, and in April 1965 the Union was certified as the collective bargaining agent for the employees. After some ten months of unsuccessful bargaining the Union placed pickets in front of Hill's store and undertook to present its case by means of newspaper and radio advertisements. Commercial time was purchased from Station WREO and from stations located in other communities where Hill's operated stores. The radio message explained that a strike was in progress, that certain issues were unresolved and that Hill's Department Store was being picketed. In conclusion the message urged that all union members, their families and friends observe and respect the picket line.[1]

According to the petition:

"When [the Union's] commercial message was first offered to the stations in early 1966, there was no difficulty, no objection, no hesitation in using it. Then, suddenly, without warning, or without adequate explanation, all within a period of a few days, station after station in Northeast Ohio found it necessary to cut off the Union's advertising.

"An important consideration is that at the same time, Hill's was engaged in commercial advertising over the stations involved, broadcasting its message of bargains for the consumer.

\* \* \* \* \* \*

"One needs to be neither cynic nor seer to understand why the Union was deprived of its right to advertise to the public on an issue of such a controversial nature. The answer is as old as the history of human pressure: one may assume that Hill's passed the 'word' to the Station, and that was enough."

In its answer to the petition Station WREO denied that it had violated the Fairness Doctrine and said that the station had offered to present without charge a program on which both the Union and Hill's Department Store could express their views.

The Union's petition was not supported by affidavit as required by § 309(d)(1) of the Communications Act, 47 U.S.C. § 309(d)(1).[2] Nevertheless the Commission, as it was empowered to do under 47 U.S.C. § 308(b), by written questions required further written statements of fact from Station WREO.[3] From these statements it appeared that between February 16 and April 5, 1966,

---

1. The full text of the Union's message was as follows:

   "ANNCR: Here is an important message from RETAIL STORE EMPLOYEES UNION LOCAL 880—regarding the picket line now at HILL'S DEPARTMENT STORE in Youngstown. The picket line is in support of the strike at HILL'S DEPARTMENT STORE in Ashtabula. This strike now in progress at HILL'S comes after seven months of continuous negotiations, during which no agreement has been reached between the Retail Store Employees Union Local 880—and the management of HILL'S DEPARTMENT STORE. Important issues still not resolved include Union Security, Arbitration and Grievance Procedure, Health and Welfare, Funeral Leave, and Visitation Rights to the store.

   These, and other issues are vital to the betterment of the store employees working conditions! Some Hill's employees are still working because—if they all go out—the Company would try to replace them with non-union help who could be granted a vote in subsequent elections. The 2,000 area members of Retail Store Employees Union Local 880 request that all union members, their families and friends observe and respect the picket line now at HILL'S DEPARTMENT STORE!"

2. Subsequently, on September 12, 1968 counsel for the Union verified the petition.

3. Any falsification in the statements furnished by the station would have been subject to the penalties provided in 18 U.S.C. § 1001.

WREO carried approximately 322 of the Union's announcements. The announcements were discontinued on April 5, 1966. According to the station the reason for the discontinuance was that "the continuous repetition of these partisan announcements had become an irritant to WREO's listening audience"; that the station felt it would "have no further part in the controversy which was going on between the Union and Hill's Department Store".

Both the station and Hill's flatly denied that the store or anyone on its behalf had sought to influence WREO in the matter of the cancellation of the Union's announcements. It was conceded that commercial advertisements on behalf of Hill's Department Store were carried by the station throughout the year 1966.

On these facts the Commission in its Memorandum Opinion concluded first that the Union's petition to deny was defective, in that it was not supported by a statement under oath that the allegations contained therein were true to the personal knowledge of the affiant. The Commission concluded further:

"As to the fairness aspect, the licensee has presented the Local 880's advertisements, and after notifying Hill's and Local 880 that it would air no more announcements on the subject of the Ashtabula strike, it issued both sides an invitation to air their respective views on the strike over its facilities free of charge. In the circumstances, there is no need to consider further issues under the fairness doctrine. Further, we hold that WREO's refusal to accept additional ads from Local 880 after April 1966 was, for the reasons advanced by the station, within the proper limits of its discretion (McIntire v. Wm. Penn Broadcasting Co., 151 F.2d 597, (1945))."

Finally, the Commission found that there were no unresolved questions of fact remaining and that the grant of the WREO renewal would serve the public interest, convenience and necessity; and accordingly, the Union's petition was denied.

On this appeal the Union in its brief concedes that, "The Union was unable to substantiate its claim that Hill's had brought pressure on the stations, which reduces the issues here primarily to the fairness doctrine and collateral legal questions involved, including that of a hearing." In substance the Union argues that the Commission was arbitrary and capricious in finding, without a hearing, that WREO had not violated the Fairness Doctrine.

The Communications Act provides that no hearing on a petition to deny the renewal of a broadcast license need be held if the petition fails to contain specific allegations of fact sufficient to show that the petitioner is a party in interest and that the renewal would be prima facie inconsistent with the public interest, convenience and necessity. 47 U.S.C. § 309 (d) (1). If there are no substantial and material questions of fact and the renewal would be consistent with the public interest, convenience and necessity the petition shall be denied and the renewal granted without a hearing. 47 U.S.C. § 309(d) (2). If the Commission cannot make such a finding, however, and if a substantial and material question of fact is presented, the application for renewal shall be set for hearing on the issues raised. 47 U.S.C. § 309(e). *See* Southwestern Operating Company v. F. C. C., 122 U.S.App.D.C. 137, 351 F.2d 834 (1965). The question before us therefore is whether the Commission acted arbitrarily and capriciously in finding that there was no substantial and material question of fact with respect to the alleged violation of the Fairness Doctrine by Station WREO, and in finding without a hearing that a renewal of the station's license would be consistent with the public interest, convenience and necessity.

The essential facts material to the alleged violation of the Fairness Doctrine by the station are plain. Over a period of approximately seven weeks in 1966 the station broadcast some 322 of the Union's announcements. The announcements were then discontinued by the sta-

tion for the assigned reason that they were annoying to listeners and that the station did not choose to become involved in the labor dispute. During this same period the station broadcast commercial advertising for Hill's Department Store, and these broadcasts were continued after the Union announcements were stopped. On these facts the Commission held as a matter of law that there had been no violation of the Fairness Doctrine by Station WREO.

The Fairness Doctrine promulgated by the Commission requires that a broadcaster give adequate coverage to public issues and that coverage must be fair in that it reflects the opposing views. Red Lion Broadcasting Co. v. F. C. C., 395 U.S. 367, 377, 89 S.Ct. 794, 23 L.Ed.2d 371 (1969). The interpretation and application of the Doctrine are primarily matters confided to the sound judgment and discretion of the Commission. Cf. Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965). In the administration of the Doctrine the Commission has stated that the selection and presentation of program material are the responsibility of the licensee, not the Commission; and all the Commission requires is that the licensee make a reasonable effort in good faith to give a fair and well-rounded presentation of public issues. See Report on Editorializing by Broadcast Licensees, 13 F.C.C. 1246 (1949); Letter to Oren Harris, 3 Pike & Fischer, R.R.2d 163, 167 (1963); Applicability of the Fairness Doctrine in the Handling of Controversial Issues of Public Importance (Fairness Primer), 29 Fed.Reg. 10415, 10416 (1964). In many decisions applying these principles to specific cases the Commission has held that broadcasters have a wide area of discretion in which to exercise their journalistic judgment in complying with the Fairness Doctrine, and that review by the Commission of the actions of licensees in this area is limited to a determination of the good faith and reasonable nature of such actions. See Citizens Against Proposition 15, 3 Pike & Fischer, R.R.2d 777 (1964); Mid-Florida

Television Corp., 4 Pike & Fischer, R.R. 2d 192 (1964); Mrs. Madalyn Murray, 5 Pike & Fischer, R.R.2d 263 (1965); American Friends of Vietnam, Inc., 6 Pike & Fischer, R.R.2d 126 (1965); Miss Geri Tully, 6 Pike & Fischer, R.R. 2d 123 (1965). It is established law that the scope of this court's review in such cases is limited and that when there is a rational basis in the record for the result reached by the Commission its action should be affirmed. See Red Lion Broadcasting Co. v. F. C. C., 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969); Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); United States v. Storer Broadcasting Co., 351 U.S. 192, 76 S.Ct. 763, 100 L.Ed. 1081 (1956); McCarthy v. F. C. C., 129 U.S.App.D.C. 56, 390 F.2d 471 (1968); Philadelphia Television Broadcasting Co. v. F. C. C., 123 U.S.App.D.C. 298, 359 F.2d 282 (1966).

The Commission in its brief, and for the purposes of this litigation, assumes that the Fairness Doctrine applies in the circumstances of this case. Assuming that the Fairness Doctrine applies, I would hold that the Commission's decision to renew WREO's license has a rational basis in the record and is a reasonable application of the Doctrine. I would hold further that on the undisputed facts no hearing was necessary.

There is a reasonable basis in the record for the Commission's conclusion that WREO dealt with the Union fairly and in good faith. The station carried the Union's message on 322 occasions over a period of weeks, so that the public was fully advised as to the Union's views with respect to the pending labor dispute. In addition, the station offered free time to the Union to present its views in a discussion program with representatives of the store. The offer was rejected by the Union. Finally, as the Union now concedes, investigation disclosed that there was no basis in fact for the allegation that in terminating the Union's announcements the station acted in bad faith as a result of pressure by the department store. On such a record I can-

not say that the Commission was arbitrary or capricious in finding that there was no violation of the Fairness Doctrine.

The Commission's decision with respect to the station's alleged violation of the Fairness Doctrine was based upon the facts disclosed in the pleadings and developed by the Commission's own investigation. In this situation it was not unreasonable for the Commission to conclude that no hearing was necessary; for the facts having been established, there was nothing to hear. In my judgment a "suspicion that something might have been amiss", upon which the majority opinion relies, was not enough to call for a hearing.

The only remaining question was whether the Union alleged facts sufficient to make a prima facie showing that renewal of WREO's license would not serve the public interest, convenience and necessity. Since the Union's petition was based wholly on an alleged violation of the Fairness Doctrine, a violation the Commission did not find, the answer to this question was plainly no. I conclude, therefore, that renewal of WREO's broadcasting license was not arbitrary or capricious and that the action of the Commission should be affirmed on this ground.

Although for the purposes of discussion I have accepted the Commission's assumption that the Fairness Doctrine could be applied in this case, I think the assumption is invalid. Specifically, I cannot accept the implicit premise of the majority opinion, that when a radio station has broadcast advertisements of the goods or services of a private business which is engaged in a dispute with a labor union, the Fairness Doctrine requires the station to broadcast the union's views on the labor dispute. In my judgment this case illustrates the fallacy of that premise.

According to the Union's broadcast message the important unresolved issues in its dispute with the store were "Union Security, Arbitration and Grievance Procedure, Health and Welfare, Funeral Leave, and Visitation Rights to the store". See Note 1, above. The store's routine advertisements of goods and wares for sale were not relevant to the issues thus formulated by the Union, that is, the advertisements were not a presentation of the store's side of the labor controversy. Accordingly, there was no occasion to invoke the Fairness Doctrine to assure that the Union's side would be heard.

The theory of the majority would extend to the store's advertisements the rule applied by the Commission in the case of cigarette advertising. In the Matter of Television Station WCBS-TV, New York, New York (Applicability of Fairness Doctrine to cigarette advertising) 9 F.C.C.2d 921 (1967). As the Commission in its opinion emphasized, however, "cigarette advertising presents a unique situation". (9 F.C.C.2d at 942, 943.) I cannot agree that the principle of that decision ought to be applied to the commercial advertising of a department store simply because the store at the moment is involved in a labor dispute.

