**DEMOCRATIC NATIONAL COMMITTEE, Petitioner,**

v.

**FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents.**

**No. 71–1738.**

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 31, 1972.

Decided Feb. 22, 1972.

Mr. Charles H. Wilson, Jr., Washington, D. C., with whom Messrs. Joseph A. Califano, Jr. and J. Alan Galbraith, Washington, D. C., were on the brief, for petitioner.

Mr. Joseph A. Marino, Counsel, F. C. C., with whom Messrs. Richard E. Wiley, Gen. Counsel at the time the brief was filed, Richard R. Zaragoza, Counsel,

F. C. C., Howard E. Shapiro and George Edelstein, Attys., Dept. of Justice, were on the brief, for respondents. Mr. John H. Conlin, Associate Gen. Counsel, F. C. C., at the time the record was filed, also entered an appearance for respondent Federal Communications Commission.

Before McGOWAN, ROBB and WILKEY, Circuit Judges.

PER CURIAM:

Petitioner Democratic National Committee seeks review and reversal of an order of the Federal Communications Commission [1] which (1) extended the time for filing comments in regard to a broad-ranging inquiry by the Commission into the efficacy of the fairness doctrine and the appropriate scope of the FCC's equal opportunities requirement, and (2) refused to separate its review of the applicability of the fairness doctrine from the equal opportunities requirement to political broadcasts and other aspects of the inquiry. On the procedural issue involved here we find that the Commission action was reasonable and within its agency discretion, and thereby deny the petition.

I.

A brief chronology will put the issue and the positions of the parties in perspective. In 1970 in response to an FCC notice of inquiry and proposed rule-making,[2] the petitioner Democratic National Committee proposed that the FCC adopt a rule which in effect interjected into the fairness doctrine the statutory requirement of "equal opportunities" of § 315(a),[3] and created a presumption that any Presidential broadcast dealt with "controversial issues of public importance" to which those holding a significantly different point of view would have a right of equal oppor-

tunity to respond. After other broadcasters and interested groups had filed comments with the Commission, but the Commission had taken no action in the rule-making proceeding, in April 1971 the petitioner filed a written request for action without further delay. In June 1971 the FCC issued a new notice of inquiry in the context of a rule-making proceeding captioned "The Handling of Public Issues Under the Fairness Doctrine and the Public Interest Standards of the Communications Act," [4] which was "a broad-ranging inquiry into the efficacy of the fairness doctrine and other Commission public interest policies, in light of the current demands for access to the broadcast media to consider issues of public concern." [5]

The new inquiry was divided into four parts: "(i) the fairness doctrine generally; (ii) access to the broadcast media as a result of the presentation of product commercials; (iii) access generally for discussion of public issues; and (iv) application of the fairness doctrine to political broadcasts." [6] The last part of the inquiry, it is agreed, would encompass the proposal made by petitioner in the previously noticed inquiry and rule-making proceeding.

From its own point of view petitioner's overriding concern was with expedition in the matter, for on 27 July 1971 petitioner filed a request to separate the last issue out of the overall proceeding, hopefully in order to resolve it before the 1972 Presidential primaries rose to a crescendo. We are not unsympathetic to the reasonableness of petitioner's position on this point, because it is undeniable that petitioner early in 1970 could foresee the very problems which have arisen, the time at which they would become critical, and took every timely action to put the specific issue squarely

1. 31 FCC 2d 480 (1971).

2. Obligations of Broadcast Licensees Under the Fairness Doctrine, 23 FCC2d 27 (1970).

3. 47 U.S.C. § 315(a), as amended 14 Sept. 1959, Pub.L. 86–274, § 1, 73 Stat. 557.

4. 30 FCC 2d 26 (1971).

5. Id.

6. Id.

before the Commission. On the other hand, other participants in the rule-making proceeding, with different priorities of interest in the various aspects to be decided, were more impressed with the overall importance and enormous complexity of what the Commission was undertaking, and sought more time to ponder and reflect before filing their considered opinions with the Commission.[7]

At this point it is fair to note the impact which decisions of this court itself undoubtedly have had on the Commission and the ramifications they have interjected into an inherently complex problem. Beginning with Retail Store Employees Union, et al. v. FCC (1970),[8] dealing with the fairness doctrine generally; continuing with Friends of the Earth v. FCC (16 August 1971),[9] which but followed the landmark Banzhaf v. FCC (1968)[10] in regard to access to broadcast media as a result of the presentation of product commercials; closely preceded by Business Executives Move for Vietnam Peace v. FCC (3 August 1971)[11] and Green v. FCC (18 June 1971)[12] in regard to access generally for the discussion of public issues; and finally the application of the fairness doctrine to political broadcast in CBS, Inc. v. FCC (15 November 1971)[13] and Democratic National Committee v. FCC (2 February 1972)[14]—the Federal Communications Commission has literally seen the law in this field explode, as knowledgeable and aggressive parties recognized the potential, and legal availability, of the broadcast media to expound on these public interest issues.

Confronted with this situation, and specifically urged by this court to resolve some of the underlying issues in rule-making rather than adversary proceedings,[15] it is not to be wondered that the FCC revised its original limited plan to examine the applicability of the fairness doctrine to political broadcasting alone in favor of a more comprehensive study of fundamental interrelated questions.

By the order here challenged, the FCC denied the petitioner's request for separation, stating that it would not be "appropriate to decide the issues raised [in the May 1970 inquiry] apart from the overall review of the Commission's fairness policies in the [broader June 1971 inquiry]."

## II.

Thus the specific issue before us is a very narrow procedural one—whether the Commission abused its discretion in refusing to separate from its broad analysis of the fairness doctrine its consideration of the right to respond to Presidential broadcast appearances, and in refusing to accelerate the deadlines for interested parties to file their views. We are not called upon to decide the merits of petitioner's request, which in effect would amend § 315(a) of the Communications Act to specify that "equal opportunities" applies to *all* broadcast appearances by the President, and that he is *presumed* in a formal address or televised news conference to discuss "controversial issues of public importance," thus invoking also the ex-

7. Motion of American Civil Liberties Union for Extension of Time, filed 28 July 1971, Joint Appendix, p. 38; Petition of National Association of Broadcasters for Extension of Time, filed 4 August 1971, Joint Appendix, p. 41.

8. 141 U.S.App.D.C. 94, 436 F.2d 248 (1970).

9. 146 U.S.App.D.C. 88, 449 F.2d 1164 (1971).

10. 132 U.S.App.D.C. 14, 405 F.2d 1082, cert. denied sub nom. Tobacco Institute

v. FCC, 396 U.S. 842, 90 S.Ct. 50, 24 L. Ed.2d 93 (1969).

11. 146 U.S.App.D.C. 181, 450 F.2d 642 (1971).

12. 144 U.S.App.D.C. 353, 447 F.2d 323 (1971).

13. 147 U.S.App.D.C. 175, 454 F.2d 1018 (1971).

14. 148 U.S.App.D.C. ——, 460 F.2d 891 (1972).

15. Hale v. FCC, 138 U.S.App.D.C. 125, 129, 425 F.2d 556, 560 (1970).

isting standards of the fairness doctrine. The merits of this proposal are not before us.[16] The ruling sought by petitioner on the procedural issues was stated at oral argument to be an order to the FCC to resolve the issues under Part IV of its proposed rule-making proceeding within 30 days.

Assuming that in exceptional circumstances we might grant such relief,[17] it is not justified by the facts of this case. At oral argument on 31 January 1972, the factual situation appeared somewhat different from that existing at the time of filing briefs. It may not be true that "time heals all wounds," but time may afford some relief. We were informed by counsel for the Commission that all original views and replies to those views on Part IV have been filed. The Commission's new rules on this particular aspect will be issued by late spring or early summer. The difference between what petitioner requests that we order the Commission to do and what the Commission says it will do is thus the difference between 30 days and approximately 100 days from the date of this decision.

Furthermore, by reason of President Nixon's public announcement that he is a candidate for the Republican nomination for President, made as a prelude to the New Hampshire primary, the petitioner agrees that the President is now a qualified candidate under § 315(a), and as far as other announced candidates for the Republican Presidential nomination are concerned, the "equal opportunities" standard of § 315(a) applies, not the fairness doctrine. As far as the announced Democratic candidates are concerned, any Presidential pronouncements would still be treated under the fairness doctrine, which is issue-oriented and requires a presentation of balanced (not necessarily equal) views on the "controversial issues of public importance" which may be raised by the President. Under this standard any licensee would be required to present in a fair balance views opposing those of the President. Presentation of those opposition views might be made by any one or more of the numerous announced Democratic candidates.

Thus we now have the situation that, from the present time until the last of the major party nominating conventions in August, the "equal opportunities" standard of § 315(a) applies to Republican Presidential nomination candidates, and the fairness doctrine concerning any "controversial issues of public importance" discussed by the President applies to all Democratic nomination aspirants seeking opportunity to reply. By the joint application of these two rules, it would seem that there are very few words which the President may utter which could not be made the subject of rejoinder by some political opponent, whether of his own or an opposition political party. We anticipate no drought in vigorous discussion of all Presidential policies on the air waves in the next six months.

Prior to the expiration of that six-month period—by the end of May or early June—as a result of its rule-making procedure we are assured that the Commission will have handed down new standards to apply to these difficult questions. To force accelerated Commission consideration of these admittedly complicated and fundamental issues, merely to gain at the most some 70 days of time, would not be in the best interest of the public or perhaps any of the parties to this or the FCC proceeding. We are in effect now being asked to order the FCC to change its calendar, to

16. For a thorough consideration of a similar proposal, see the opinion of Judge Tamm in the related Democratic National Committee v. FCC, *supra*, note 14, at —— – ——, —— – —— of 148 U.S.App.D.C., at 908–913, 903–907 of 460 F.2d.

17. See, *e. g.*, International Association of Machinists and Aerospace Workers v. National Mediation Board, 138 U.S.App. D.C. 96, n. 3, 425 F.2d 527, 535, n. 3 (1970); Environmental Defense Fund, Inc. v. Hardin, 138 U.S.App.D.C. 391, 397, 428 F.2d 1093, 1099 (1970).

revise its priorities, to rush consideration of a matter of the utmost importance, when this court itself has in decision after decision delineated in successive adversary proceedings many of the problems the FCC is now attempting to resolve, and this court has specifically suggested that the FCC would be better advised to treat these related matters in an extensive rule-making proceeding rather than have the rules carved out piecemeal in adversary proceedings. The Federal Communications Commission is acting as this court has suggested, we believe as expeditiously as possible, and we therefore deny petitioner's request to compel the Commission to alter that procedure.

So ordered.